Thomas C. KNARR

v.

The BOARD OF SCHOOL TRUSTEES OF GRIFFITH, INDIANA, et al.

Civ. No. 70 H 86.

United States District Court,
N. D. Indiana,
Hammond Division.

Sept. 25, 1970.

Saul I. Ruman, Hammond, Ind., for plaintiff.

William J. Muha, Highland, Ind., Joel C. Levy, Hammond, Ind., for defendants.

## MEMORANDUM

BEAMER, District Judge.

Plaintiff Knarr was a Social Studies teacher at Griffith High School from September 1965 through June of 1970. Had his teaching contract been renewed for the 1970–71 school year, Knarr would have attained tenure. After receiving notice on April 29, 1970, that his contract would not be renewed, Knarr brought this suit under 42 U.S.C. § 1983 contending that the defendants had violated his constitutional rights of free speech and association. A second count in the complaint was based on diversity of citizenship and alleged that the defendants had breached plaintiff's contract with the Griffith School System. The matter was heard on a trial on the merits, and judgment has been entered for the defendants on both counts.

No evidence was presented to support the allegations of Count II that defendants had breached plaintiff's teaching contract. It will only be necessary in this memorandum, therefore, to explain why the Court concluded that plaintiff had failed to prove the allegations in Count I that his nonretention was a deprivation of his Constitutional rights.

Under the provisions of Ind.Stat. Ann. § 28–4307 a person who teaches in a school system for 5 consecutive years, and then receives a contract for another year, becomes a permanent teacher. The contract of a permanent teacher is deemed to be for an indefinite period of time. The contract of a non-tenure teacher, such as plaintiff, is subject to renewal each year. This initial five year period affords the school time to determine whether a teacher is one who should attain permanent status. As stated by the Court in Zimmerman v. Bd. of Education of Newark, 38 N.J. 65, 183 A.2d 25, 29 (1962):

> Inherent in the tenure legislation is the policy that a board's duty to hire teachers requires more than merely appointing licensed instructors; it demands that permanent appointments be made only if the teachers are found suitable for the positions after a qualifying trial. In essence this constitutes a "proving out" period.

The importance of the decision to place a teacher on tenure was reflected in a comment of William Cheever, the Griffith Superintendent of Schools:

> [W]hen you are considering putting a teacher on tenure, you are talking about maybe twenty, maybe thirty years, and 150 kids a year going through a room. I think as Superintendent of Schools, it is my responsibility to consider this very carefully.

The decision whether to offer a teacher a contract for the sixth year is, of course, a crucial one. In the words of Ben McKay, principal of the Griffith High School:

> An evaluation due at tenure time is quite different from one due at another time. The one due now has long-reaching effects, for a tenure contract means a person, for all practical purposes, can remain in the school for as long as he wishes. One must, therefore, in offering a tenure contract, look back over all the preceding years and establish whether or not the person being offered the contract has worked well with the students, the teachers, and the administration in carrying forward the ideals and ideas of the school.

In determining whether to permit a teacher to attain permanent status, the latitude of discretion of a school board must necessarily be quite broad. "We do not think it within the province of the federal court to pass upon and decide the merits of all of the internal operative decisions of a school district. * * * School boards are representatives of the people, and should have wide latitude and discretion in the operation of the school district, including employment and rehiring practices." Freeman v. Gould Special School District of Lincoln County, Ark., 405 F.2d 1153, 1161 (8th Cir. 1969). Although the Court will not substitute its judgment for that of the school board, it must look to see whether the board has acted lawfully. The decision of a school board not to renew a teacher's contract is impermissible if it deprives a teacher of constitutionally protected rights. Pickering v. Board of Education, 391 U. S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); McLaughlin v. Tilendis, 398 F. 2d 287 (7th Cir. 1968). Plaintiff contends that the decision of the school board not to retain him was made in retribution for his union activities, and therefore deprived him of his freedom of speech and association guaranteed by the First Amendment to the United States Constitution.

The evidence showed that plaintiff became a member of the Griffith Federation of Teachers, the "union," during his first year in the Griffith school system. Knarr became a member of several union committees, including the grievance

committee. During the 1968–69 school year, Knarr was vice-president of the union. In 1969 he lost the election for president of the union. Knarr was also an alternate member of the union's contract negotiating committee. Plaintiff was also one of the primary instigators of the one-day teachers strike in the fall of 1969. The evidence disclosed that some of the defendants were aware that Knarr was an active union member, although none of the defendants knew the full extent of his union activities.

■ Although plaintiff was able to establish that he was an active union member and that his contract for employment was not renewed, he failed to present any credible evidence that there was a causal connection between those two facts. Plaintiff attempted to show that the school administration was generally biased against the members of the union, and that his active participation in the union led to his nonretention by the school board. The evidence, however, clearly showed that membership and active participation in the union was in no way a barrier to employment or promotion in the Griffith school system. One union member was made principal of a junior high school in Griffith; others were heads of their departments in the High School. Three members of the union's contract negotiating team this year were given teaching contracts for the coming school year, placing them on permanent status. Gerald Spejewski, probably the union's most active member, was placed on tenure last year—after being chief negotiator for the union and serving for a year as its president. Defendants testified that their decision not to rehire plaintiff was in no way a retaliation for his union activity. There was no contention that other union members had been released because of their union activities. It is incongruous that a school board with a bias against the union, as alleged by the plaintiff, would exercise that bias by preventing only one union member from attaining tenure while elevating several others to permanent status and promoting other members

of the union. The Court is convinced that the school administration was not acting under a bias against the union generally, or against the plaintiff in particular because of his union activity.

Plaintiff has thus failed to meet his burden of proof that the actions of the defendants deprive him of his constitutional rights as alleged in Count I of the complaint. It is therefore unnecessary for the Court to examine the reasons given by the defendants for not renewing plaintiff's contract. It would, of course, be inappropriate for the Court to attempt to weigh the evidence relied upon by the school officials and substitute the Court's judgment for that of the defendants. Nevertheless, a review of some of the evidence will make it clear that there was a substantial basis for the decision not to renew plaintiff's contract, and that the motives of the defendants were proper.

At Knarr's request, the Griffith School Board furnished him with the following reasons for his nonretention:

1. The fact that you have been late in arriving at school on more than one occasion.

2. Your tendency toward insubordination and neglect of duty.

3. Your obvious and stated lack of concern for parents in a *public* school.

4. The dissension and divisiveness you have caused among your fellow teachers.

5. The significant difference of your educational philosophy from that desired by the Griffith Public Schools.

In each year that Knarr taught in the Griffith school system there were examples of his failure to arrive at school on time in the morning. The head of the Social Studies Department commented on this being a problem in the "Analysis for Professional Growth" for Knarr in March of 1968. According to the testimony of students, teachers, and school administrators, Knarr's lack of concern for punctuality was as great during the 1969–70 school year as it had ever been.

Knarr's "tendency toward insubordination" was reflected in an incident involving the school's dress code. As related by Principal McKay in March of 1970:

> Mr. Knarr came perilously close to insubordination this year when he gave students in his class advice as to how to handle the old dress code when the school was making every effort to revise it and bring it into line with current legalities. A bulletin was issued from the high school office asking teachers to discuss the matter and enlist student cooperation until the work could be completed. Mr. Knarr chose instead to counsel violation of the old dress code.

Knarr had told one of his classes that if enough students would wear slacks and blue jeans (which were not permitted under the old dress code) the school administration could do nothing about it because they couldn't send everyone home.

On two other occasions plaintiff gave evidence of his insubordinate attitude. Knarr once stated to McKay that he did not want to become a school administrator to work on problems because "administrators are bastards." While talking in the spring of 1969 about a possible teachers strike, Knarr said of the administration: "We are going to bring those bastards to their knees."

As to Knarr's lack of concern for parents, there was testimony that during one semester Knarr failed to send out the customary "poor work" notices to parents of students doing unsatisfactory work. In another incident, it was suggested at a meeting that parents be allowed to participate in the development of a new Honor Roll system. Knarr commented that he taught students, not parents.

The fourth reason listed for plaintiff's nonretention was that he caused dissension and divisiveness among the teachers. Again in the words of Principal McKay:

> Mr. Knarr is a strong and forceful personality who by nature or by design has engendered hostility and ill-feeling within the professional staff. Never have I had one individual who has incurred so much divisiveness within the staff as this young man. Teachers, in the normal course of events, get 'hurty' feelings with one another, and then they get well. With Mr. Knarr the feelings seemingly do not get repaired.

In one example, Carl Dalton, the head of plaintiff's department, testified that he had been in the habit of greeting Knarr with: "Good morning, Tom. How are you?" One day Knarr stopped Dalton in the hall and "jumped all over" him for asking "How are you?" Knarr displayed a bellicose attitude while criticizing Dalton for asking such an unnecessary question.

In the spring of 1969, Knarr showed his lack of tact to Mrs. Oyler, the clothing teacher. Mrs. Oyler and her clothing class had worked hard on a clothing exhibit, but it looked like attendance would be poor. The following note from the principal was sent to all teachers: "Please stop in at the clothing fair during your prep period. The girls have worked very hard to make it a success." When Knarr visited the exhibit, he commented in front of the students and the teacher that he was there only because he had been ordered to be.

At a teachers' dinner party at a public restaurant, Knarr arrived late and, according to the testimony, under the influence of alcohol. Knarr was very loud and used profanity. One of the teachers at the dinner testified that Knarr's actions embarrassed all the teachers present. Another teacher, a former officer in the union, testified that Knarr drank heavily at a teachers' party at the home of another union member. He became obnoxious, using profanity to such an extent that his host had to tell him to behave himself or leave.

Witnesses also complained of Knarr's inability to cooperate with other members of the Griffith staff. Plaintiff at

times refused to let students out of his class to assist teachers in special projects. A counselor testified that Knarr often ignored his requests to send students from class for counseling. There was also testimony of an incident where Knarr kept a student from going to his next class without notifying the teacher that he was detaining the student.

There is also evidence that Knarr played a part in creating the friction that exists today between the two teachers organizations at Griffith, the Griffith Federation of Teachers (the union), and the Griffith Teachers Organization (G.T.O.). During 1969, the union was the collective bargaining representative of the teachers in Griffith. Plaintiff was one of the prime motivators of the teachers' one day strike in the fall of 1969. Fifteen to twenty members of the union strongly opposed the strike and decided to quit the union. Most of these joined the G.T.O., which was formed shortly after the strike. The G.T.O. has since become the collective bargaining representative of the teachers. Knarr's outspoken criticism of the rival organization has added to the animosity which exists between the teachers at Griffith. These circumstances have led Mr. McKay to comment: "In a situation where unified efforts are needed to get the job done, I feel that Mr. Knarr fragments rather than unifies."

The final basis for the school board's decision not to renew Knarr's contract was the significant difference in Knarr's educational philosophy from that desired by the School Board. There was substantial evidence to support the defendants' conclusion that Knarr had abused his teaching position by using his classroom "as his personal forum to promote union activities, to sanction polygamy, to attack marriage, to criticize other teachers and to sway and influence the minds of young people without a full and proper explanation of both sides of the issue." Knarr belittled students who challenged his opinions. He used language that defendants considered inappropriate in the classroom. On the witness stand, plaintiff admitted telling his class that if his statements were repeated outside of the classroom he would deny, under oath, having made them. Such a statement not only sets a poor example for students, but is also a tacit admission of the impropriety of the comments.

It is significant to note that the defendants' reasons for not renewing plaintiff's contract all relate directly to plaintiff's performance in the classroom and/or the smooth functioning of the school system. In denying plaintiff tenure, the school administrators were not acting with a desire to deprive plaintiff of his freedoms of speech and association. The First Amendment freedoms of a teacher are necessarily affected by the right of the school board to retain only those teachers who adequately discharge their teaching responsibilities and do not disrupt the efficient operation of the school. To the extent that this is a restriction on the freedom of a teacher, it is only incidental to the exercise of the school board's duty to maintain good schools. It is a question of balancing the interest of the teacher with that of the State. Pickering v. Bd. of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The situation here is similar to that described in Parker v. Bd. of Education of Prince George's County, Md., 237 F. Supp. 222, 229 (D.Md.1965):

> Where the abridgement of the abstract right of free speech results from government action taken for the protection of other substantial public rights, no constitutional deprivation will be found to exist, American Communications Ass'n, CIO v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

The Court is convinced that the decision of the defendants not to place plaintiff on tenure status was based on a reasoned appraisal of plaintiff's abilities and shortcomings. There is no credible

evidence to support plaintiff's contention that defendants acted with a bias toward the union or an intent to deprive plaintiff of his constitutional rights. The complaint therefore must be dismissed on the merits.