Paul G. SIMARD et al., Appellants,

v.

BOARD OF EDUCATION OF the TOWN
OF GROTON et al., Appellees.

No. 232, Docket No. 72–1772.

United States Court of Appeals,
Second Circuit.

Argued Dec. 6, 1972.

Decided Jan. 30, 1973.

Ralph P. Dupont, New London, Conn.
(Dupont, Pavetti & Dupont, Robert D.
Tobin, Antoinette L. Dupont, New Lon-
don, Conn., Gould, Killian & Krechevsky,

Hartford, Conn., Martin Gould, Hartford, Conn., on the brief), for appellants.

Richard D. O'Connor, Hartford, Conn. (Siegel & O'Connor, Hartford, Conn., on the brief), for appellees.

Before LUMBARD, FEINBERG and MANSFIELD, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Paul G. Simard, a language teacher, was denied tenure by the decision of defendant Board of Education of Groton, Connecticut not to renew his one-year contract. Alleging that his constitutional rights were violated by this action, plaintiff and three teacher associations brought this action against the Board, seven of its members and four other individual defendants in the United States District Court for the District of Connecticut under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3).[1] Plaintiff Simard sought preliminary, as well as permanent, injunctive relief. He rejected the court's suggestion that, pursuant to Fed.R.Civ.P. 65(a)(2), the hearing on the application for a preliminary injunction be consolidated with the trial of the action on the merits, and a hearing as to preliminary relief only was held in June 1971, at which five witnesses testified. Thereafter, Chief Judge M. Joseph Blumenfeld, in a thorough opinion, denied the application and also denied defendants' motion to dismiss the complaint. A full trial was held some seven months later, at which ten witnesses testified, after which Judge Blumenfeld dismissed the complaint.[2] We agree with the judge's conclusion that on the facts of this case, plaintiff is not entitled to relief. Accordingly, we affirm the judgment of the district court.

I

Simard taught French and Latin at the Fitch Senior High School in Groton from September 1968 until August 1971. From the beginning of his employment, Simard had been an active member of the Groton Education Association (GEA), which negotiated teachers' contracts with the Board of Education. He served as Vice-President and President of the GEA and, in 1970–71, as Chairman of the Professional Rights and Responsibilities Committee, the negotiating arm of the GEA. Teacher contract negotiations, at least from 1965 to 1971, had been less than amicable, resulting in two work stoppages in 1967 and 1969. Negotiations for the 1971–72 contract, in which Simard served as chief negotiator for the GEA, were characterized by particular bitterness and recrimination.

The relevant portions of the Connecticut statute governing employment of teachers are set forth in the margin.[3]

---

1. The association plaintiffs are the Groton Education Association, Inc., the Connecticut Education Association, and the National Education Association. For the sake of convenience, we will usually refer only to plaintiff and appellant. The individual defendants, in addition to the Board members, are Richard Chapman, Superintendent of Schools, Ronald K. Gandia, principal of Fitch Senior High School, and Louis Caouette and Robert Laing, vice-principals.

2. Neither of Judge Blumenfeld's opinions is reported.

3. Conn.Gen.Stat. § 10–151 provides in part:
 (a) . . . The contract of employment of a teacher . . . may be terminated at any time for any of the reasons enumerated in subdivisions (1) to (6), inclusive, of subsection (b) of this section, but otherwise it shall be renewed for a second, third or fourth year unless such teacher has been notified in writing prior to March first in one school year that such contract will not be renewed for the following year, provided, upon the teacher's written request, such notice shall be supplemented within five days after receipt of such request by a statement of the reason or reasons for such failure to renew. Such teacher may, upon written request filed with the board of education within ten days after the receipt of such notice, be entitled to a hearing before the board to be held within fifteen days of such request. The teacher shall have the right to appear with counsel of his choice at such hearing.

The parties agree that had Simard's contract been renewed for the 1971–72 academic term, he would have achieved tenure by the operation of law; and it is conceded that the rights of a school teacher in Connecticut are greater after he has achieved tenure status.[4] In early February 1971, however, he was notified by defendant Chapman, the Groton Superintendent of Schools, that his contract would not be renewed for the coming year—a decision that effectively denied him tenure. Simard's skill as a classroom teacher is not disputed on the record before us. Instead, the Superintendent predicated nonrenewal of the contract on two of the six grounds set forth in the Connecticut statute: "insubordination against reasonable rules of the board of education," § 10–151(b)(2), and "other due and sufficient cause," § 10–151(b)(6). To this statement of reasons was appended a list of 21 specific instances of conduct which allegedly formed the basis for the Superintendent's decision.[5]

Upon appellant's request and as authorized by statute § 10–151(a), the Board conducted a public hearing on the Superintendent's decision not to renew plaintiff's contract. The hearing, at which six witnesses testified, extended over four days in early March 1971. Simard was represented by counsel and was afforded the opportunity to call witnesses and to cross-examine; Simard was also given a transcript of the proceedings without cost. After the hearing, the Board unanimously concluded, in a seven-page opinion, that there were "adequate grounds for the Superintendent of Schools to deny Mr. Simard a teaching contract for the following year . . . ." The Board took pains to observe that it had in no way been influenced by Simard's affiliation with the GEA or by his prominent role in contract negotiations. The Board stated:

> The various infractions of the rules and regulations taken as a whole indicated to the Board that the likelihood of Mr. Simard conforming to such reasonable rules and regulations in the future was minimal. . . .
> The incidents cited by the Superintendent of Schools and the administrators of the school system in the statement of reasons appear to be symptoms of an attitude on the part of Mr. Simard that is deemed by the Board of Education not to be conducive to a fair and effective administration of the school system. The fact that Simard was often late to his class assignments; that he failed to supervise his assigned classes in accordance with the established rules and express direction of the Principal; that he failed to cooperate in the preparation of necessary outlines for the high school evaluation; that his presence in the administration offices and stockroom at Fitch Senior High School were unauthorized and unex-

(b) Beginning with and subsequent to the fourth year of continuous employment of a teacher by a board of education, the contract of employment of a teacher shall be renewed from year to year, except that it may be terminated at any time for one or more of the following reasons: (1) Inefficiency or incompetence; (2) insubordination against reasonable rules of the board of education; (3) moral misconduct; (4) disability, as shown by competent medical evidence; (5) elimination of the position to which the teacher was appointed . . . (6) other due and sufficient cause. . . .
Subsection (b) goes on to provide: that prior to termination, a teacher shall receive written notice; that on request within five days of notice, he shall receive within five days a statement of reasons for termination; that within 20 days of receipt of notice of proposed termination, he may request a hearing, to be held within 15 days of the request; that the teacher or the Board may request a public hearing; that the teacher may appear at the hearing with counsel; that a written decision shall be rendered by the Board within 15 days of hearing; that a free transcript of the hearing will be provided.

4. See Devlin v. Bennett, 26 Conn.Sup. 102, 213 A.2d 725 (1965).

5. The statement of reasons was set forth in a letter, dated February 25, 1972, from the Superintendent in response to a request from plaintiff's attorney.

plained; and the fact that he directly challenged the authority of the supervising Principal of the high school and read one of the written reprimands issued by his Principal to his students, all reflect conduct and an attitude not consistent with the professional responsibility of a member of the staff of the high school.

Plaintiff claims that the Board deprived him of both procedural and substantive due process as guaranteed by the fourteenth amendment and that it unconstitutionally penalized him for his exercise of rights protected by the first amendment.

## II. The Due Process Claims

■ At the threshold, successful assertion of any due process claims turns on whether Simard's interests in renewal of his contract with tenure thereafter rise to the level of those encompassed by the fourteenth amendment's protection of "liberty" and "property." In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2717, 33 L.Ed.2d 581 (1972), the Supreme Court considered the interests of non-tenured teachers and concluded that to show deprivation of liberty, a complainant must demonstrate that the reasons given for denial of tenure would "seriously damage his standing and associations in the community" or foreclose "his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707. To have a protected property interest, the Court

continued, is to have more than a "unilateral expectation" of continued employment; some "legitimate claim of entitlement to it" must be established, 408 U.S. at 577, 92 S.Ct. at 2709, by showing either concrete state rules and regulations or a well-established joint understanding amounting to a *"de facto* tenure program." 408 U.S. at 599–602, 92 S.Ct. 2717. The parties differ over whether plaintiff has alleged deprivation of interests constituting liberty or property as the Court has defined these elusive concepts.[6] We need not so decide, however, as we assume, for purposes of argument only, that the fourteenth amendment guarantee of due process applies.

## A. Procedural Due Process

■ As we have previously observed, however,

the inquiry does not end with this assumption; it only begins. Due process does not invariably require the procedural safeguards accorded in a criminal proceeding. Rather "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria and Restaurant Workers, Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). See Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (" 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts.")

Farrell v. Joel, 437 F.2d 160, 162 (2d Cir. 1971). Although appellant was af-

---

6. Given the Supreme Court's definition of those interests rising to the level of "liberty," we doubt that Simard is entitled to due process on this ground. See Russell v. Hodges, 470 F.2d 212 (2d Cir. 1972); cf. Canty v. Board of Education, 470 F.2d 1111, 1113 (2d Cir. 1972). Where an employee alleges that employment has been terminated in violation of the first amendment, however, the due process guarantee may have independent force. Cf. Russell v. Hodges, supra, 470 F.2d at 216; compare Board of Regents v. Roth, supra, 408 U.S. at 575 n. 14, with id. at 582,

92 S.Ct. 1701 (Douglas, J., dissenting). Moreover, it is arguable that appellant's legitimate expectation of reemployment— especially in light of the governing Connecticut statute, which seems in some respects to equate the rights of tenured and untenured teachers, see note 3 supra; but see Devlin v. Bennett, supra, 213 A.2d at 729 (legislature has "differentiated sharply between" procedures for two classes of teachers)—sufficed to constitute a "property" interest of which he could not be deprived without due process of law.

forded a statement of reasons for the action contemplated against him and a hearing as to the reasons, he calls our attention to various alleged deficiencies in procedure. First, he contends that the Board of Education was an insufficiently neutral decisionmaker. An impartial decisionmaker is a basic constituent of minimum due process. E. g., Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Wasson v. Trowbridge, 382 F.2d 807, 813 (2d Cir. 1967). Any other collateral procedural guarantees are largely without meaning if the deciding tribunal has in some way adversely prejudged the merits of the case. Appellant argues that in his capacity as bargaining representative of the GEA he engaged in heated negotiations with four members of the Board, who had thus necessarily compromised their impartiality toward him. While it is desirable that an administrative hearing be clothed "not only with every element of fairness but with the very appearance of complete fairness," Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 306 F.2d 260, 267 (1962), we would not mandate individual disqualifications in the circumstances of this case. School boards frequently negotiate with teachers in their capacity as bargaining representatives. The constitutional rule sought here would require that decisions as to teacher competence be surrendered to a body less familiar with relevant considerations and not responsible under state and local law for making these decisions. Moreover, it is unrealistic to require a Connecticut town to provide more than one body to deal with various aspects of school administration. We do not believe that due process, varying as it does with differing factual contexts, requires so much in this case, absent a showing of actual, rather than potential, bias.[7]

██ Appellant further claims that the Board prejudged the merits of his case three weeks before the hearing when, according to the minutes of its meeting, it "concurred" in the Superintendent's initial nonrenewal decision. However, the district judge found that no actual Board vote was taken at that time, that the Superintendent was at all times the moving force in the matter of tenure denial, and that the clerk transcribing the minutes merely inferred, sua sponte, that all members agreed with the Superintendent's recommendation—a decision that would initially be communicated to the Board in the normal course of school administration, well before any hearing on its merits. The very limited nature of the school board's prior involvement here is entirely consistent with due process. See Kelly v. Wyman, 294 F.Supp. 893, 907 (S.D.N.Y. 1968) (3-judge court), aff'd sub nom. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); cf. Winnick v. Manning, 460 F.2d 545, 548–549 (2d Cir. 1972).[8]

7. As will be seen below, the district judge found as a fact that the Board's decision was not a retaliatory attempt to rid itself of plaintiff because of ill will growing out of the negotiations.

8. On appeal, appellant for the first time argues that since the President of the Board, who chaired the hearing and voted on the issue of tenure, was himself the source of certain information which formed the basis for one of the 21 specified instances of objectionable conduct, he was insufficiently impartial. We do not agree. Simard denied that he had ever accused the high school principal, defendant Gandia, of stealing documents belonging to the GEA, and asserts that the only basis for believing that he did arose from remarks made in a telephone conversation with the President of the Board. However, the precise circumstances under which the President allegedly received or transmitted this information are vague. The transcript of the hearing before the Board of Education suggests that he may not have been the source at all (Transcript at 184) and that Principal Gandia himself may have construed certain of Simard's comments to him as a veiled accusation. Even if the Board President were the source, however, his conduct thereafter seems altogether innocuous; in no sense did he predetermine the adequacy of the accusation as a ground for contract nonrenewal. Compare Gilligan, Will & Co. v. SEC, 267 F.2d 461, 468–69 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

The remaining procedural due process claims are still less substantial. The statement of reasons sent to Simard was more than adequate to put him on notice as to the nature of the objections to his conduct. While the district judge found some of the "charges" to be "vague and some . . . erroneously or insufficiently dated," he also found that these inadequacies had been corrected at the hearing and in no way prejudiced appellant's ability to rebut adverse allegations. Appellant further argues that he was denied his right to learn, before the hearing, the names of adverse witnesses and the substance of their testimony. Assuming arguendo that appellant was entitled to such discovery, see Ferguson v. Thomas, 430 F. 2d 852, 856 (5th Cir. 1970), he is unable to show that his defense was in any way impeded by his failure to learn names of adverse witnesses until the hearing commenced.

Appellant also claims that the Connecticut statute, see note 3, supra, and the requirements of constitutional due process mandate a hearing before the *entire* Board of Education; and that inasmuch as two of the nine members were absent, and one missed one of the five hearings, the nonrenewal procedure was constitutionally deficient. Appellant misreads the language of the statute. Moreover, the Constitution does not require that all members of an administrative board must take part in every decision, or that the failure of one participating member to attend one hearing vitiates the entire process. Cf. Gearhart & Otis, Inc. v. SEC, 121 U.S. App.D.C. 186, 348 F.2d 798, 801 (1965). Finally, appellant observes that the school board evidently diverged from its "Plan for Evaluation of Teachers" by failing to make certain periodic assessments of his virtues and faults with respect to likelihood of tenure; he urges that the Board's failure to comply with its own regulations constitutes a denial of procedural due process.[9] We agree with the district court, however, that any such failure was harmless. Most of the required "Evaluation" is directed toward classroom competence; because appellant was denied tenure for reasons of conduct other than classroom performance, the substance of any required evaluation would have had little bearing on the Board's decision. And to the extent that the evaluation focuses on qualities found wanting in appellant, whatever notice and opportunity for correction these evaluations might normally have provided was in fact provided by less formal means.

## B. Substantive Due Process

Appellant groups a number of disparate contentions under a generalized assertion that he was denied substantive due process. He asserts that the reasons proffered for contract nonrenewal may not be so totally unrelated to legitimate educational interests of the school district as to be capricious and irrational, e. g., Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952); that a teacher may not be disciplined or denied tenure for violating rules of which he had no adequate notice, see Keefe v. Geanakos, 418 F.2d 359, 362 (1st Cir. 1969); and that the decision of the Board, even if its reasons are perfectly proper, must not be "wholly unsupported by evidence else it would be so arbitrary as to be a constitutional violation," Lucas v. Chapman, 430 F.2d 945, 948 (5th Cir. 1970). We agree with these splendid principles, but they have little to do with the facts of this case.

The reasons proffered by Superintendent Chapman for nonrenewal ranged from the comparatively serious to the trivial. The Board's opinion, quoted above, emphasized the more serious infractions. These, taken together, are not so minimally related to the ef-

9. Citing Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); and United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

fective performance of a high school teacher as to be unconstitutionally capricious or arbitrary. Accord, Knarr v. Board of School Trustees, 317 F.Supp. 832, 835–836 (N.D.Ind.1970), aff'd, 452 F.2d 649 (7th Cir. 1971); Robbins v. Board of Education, 313 F.Supp. 642, 645–647 (N.D.Ill.1970). A school system may justifiably demand more from its teachers than competent classroom instruction; a chronic refusal to comply with reasonable administrative obligations can surely have a disruptive effect on students, fellow teachers and administrators alike and consequently poses a distinct threat to an optimum learning environment. While Simard professes to have conducted himself in accord with what he understood to be the "rule" imposed by contract and custom, and claims that he had no notice of the rules allegedly breached, we agree with the district court's conclusion that much of the conduct specified—insubordination, for example—is so patently inappropriate as to require no formalized prohibition prior to discipline. Nor can we say that the proffered reasons for contract nonrenewal were unsupported by evidence. The district judge was not required to make a de novo determination of the truth of the charges against Simard, see Ferguson v. Thomas, supra, 430 F.2d at 858; review was properly confined to the sufficiency of evidence adduced before the Board, see Johnson v. Branch, 364 F.2d 177, 181 (4th Cir. 1966) (en banc), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967). Indeed, appellant did not deny many of the more serious charges but attempted to explain them away. We conclude that the Board's decision was sufficiently supported by the evidence before it.

### III. First Amendment Claims

■ Appellant's most substantial claim is that his first amendment rights were infringed because he was in fact denied tenure in retaliation for his protected activities on behalf of the GEA. This claim, if factually established, states a valid ground for federal court relief. E. g., Stolberg v. Members of the Board of Trustees, 474 F.2d 485 (2d Cir. Jan. 29, 1973) (retaliation for opposition to participation in Vietnam war), Johnson v. Branch, supra (retaliation for civil rights activity); Albaum v. Carey, 283 F.Supp. 3 (E.D.N.Y.1968) (complaint alleged retaliatory dismissal for Teacher Association activity), complaint dismissed per curiam, 310 F.Supp. 594 (E.D.N.Y.1969) (3-judge court) (allegations not factually established).

■ Circumstantial evidence in this case does provide some support for a theory of retaliatory motivation. The Board's decision to deny tenure came very shortly after the bitter contract negotiations between the Board and the GEA. Simard played a central role in those negotiations.[10] While we have concluded that adequate evidence supported the Board's action, that does not necessarily defeat a claim of retaliatory nonrenewal; a discharge motivated only in part by demonstrable retaliation for exercise of speech and associational rights is equally offensive to the Constitution. See Board of Regents v. Roth, supra, 408 U.S. at 582, 92 S.Ct. 2701 (Douglas, J., dissenting); cf. J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 300 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). The district court, however, carefully considered the claim of retaliation. Judge Blumenfeld heard testimony of numerous witnesses, including at least four members of the Board; all testified in substance that any retaliation against Simard would not have been countenanced. On the basis of this testimony, the judge concluded that "[o]nly the plaintiff's conduct as a teacher was considered" and that the Board's decision

---

10. As Judge Blumenfeld found, "words hardly conducive to harmonious bargaining were uttered by Simard, even to the extent of charging certain board members with lack of good faith and ignorance of the subject matter of the agreement being negotiated."

had not been prompted by Simard's union activity. Given the evidence before the district judge and his opportunity to assess credibility of witnesses through observation of demeanor, this finding was clearly supported by the record.[11] Moreover, much of the "evidence" allegedly showing retaliation is altogether consistent with a bona fide nonrenewal decision made in good faith. It was the administrative officers of the school— the Superintendent and the principals— who initiated the nonrenewal decision, not the Board. Furthermore, although the vast majority of formalized complaints about Simard's conduct arose in the wake of negotiations in late 1970 and early 1971, this was also the time during which a decision about his tenure had to be made. Given the critical importance of a decision on tenure, see Knarr v. Board of School Trustees, supra, 317 F.Supp. at 833, those responsible for evaluating Simard and making a recommendation about him were almost certain to be more sensitive to any objectionable conduct on his part at that time and much more likely to note adverse impressions in writing. Accordingly, we see no basis for setting aside the district court's finding.

 Appellant's subsidiary first amendment claim warrants little discussion. He primarily argues that a penalty imposed for insubordination impermissibly impinges on unrestrained self-expression. Appellant apparently concedes that the orderly operation of schools may require some limited interference with protected speech and associational activity. E. g., Pickering v. Board of Education, 391 U.S. 563, 570, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Relying on *Pickering*, however, he contends that "some evidence on the record before the Board" must reveal a "resultant disruptive effect on the school

system";[12] defendants have failed to make such a showing, he claims, because the altercation between Simard and the school principal occurred in the privacy of the high school office. The argument is without merit. Quite apart from the question whether his insubordinate remarks, constitute protected speech,[13] his reliance on *Pickering* is misplaced. There the Court noted, id. at 569–570, 88 S.Ct. at 1735, that the teacher's speech was in no way "directed towards any person with whom [he] would normally be in contact in the course of his daily work. . . ." Here, by contrast, appellant's insubordinate remarks manifestly threatened significant working relationships vital to the administration of the school; no "evidence on the record" is needed to prove that truism. Cf. Lefcourt v. The Legal Aid Society, 312 F.Supp. 1105, 1112 (S.D.N.Y.1970), aff'd, 445 F.2d 1150 (2d Cir. 1971).

Judgment affirmed.

---

11. Judge Blumenfeld additionally considered the testimony of two witnesses heavily relied on by appellant to establish retaliatory motive, and discounted it.

12. Brief for Appellants at 22.

13. Principal Gandia encountered Simard in the school office at a time when the latter had a classroom assignment. He three times asked Simard to return to his class; Simard told him "to write him another letter" and indicated that he would not return until he had checked his mail box and had a cup of coffee.