Wells H. KEDDIE, Plaintiff,

v.

PENNSYLVANIA STATE UNIVERSITY et al., Defendants.

No. 72–581 Civil.

United States District Court, M. D. Pennsylvania.

Feb. 28, 1976.

As Amended March 11, 1976.

Fred Speaker, Lewis S. Kunkel, Jr., Thomas B. Schmidt, III, Harrisburg, Pa., for plaintiff.

G. Thomas Miller, J. Thomas Menaker, McNees, Wallace & Nurick, Harrisburg, Pa., Delbert J. McQuaide, McQuaide, Blasko & Brown, State College, Pa., for defendants.

SHERIDAN, Chief Judge.

Plaintiff, Wells H. Keddie, filed this action under the Civil Rights Act, 42 U.S.C.A. §§ 1981, 1983, 1985, 1986, 1988, seeking damages and declaratory and injunctive relief against the defendants for the alleged violation of his constitutional rights and for defamation and wrongful discharge arising from his tenure denial and the consequent termination of his employment as a professor at Pennsylvania State University (hereinafter Penn State). The defendants are Penn State, John W. Oswald, President of Penn State since July 1, 1970, Stanley Paulson, Dean of the College of the Liberal Arts since April 1969, and the five members of the *ad hoc* faculty committee that reviewed plaintiff's qualifications for tenure and unanimously recommended denial thereof—

Professors Robert K. Murray, Committee Chairman, Grant Farr, Robert Friedman, Carroll C. Arnold, and Gordon DeJong. Specifically, plaintiff, formerly a nontenured assistant professor at Penn State, alleges: (1) that the University's decision to deny him tenure and to terminate his employment was impermissibly predicated on his exercise of first amendment rights; (2) that his discharge without a pretermination hearing denied him procedural due process in violation of the fourteenth amendment; (3) that the failure of the defendants to afford him an opportunity to refute the reasons given for his dismissal, which harmed his good name, reputation, honor, and integrity, is a denial of due process; (4) that the defendants conspired to deprive him of his civil rights in violation of 42 U.S.C.A. § 1985(3); and (5) that the defendants wrongfully discharged plaintiff in a defamatory manner. Plaintiff's contentions will be considered *seriatim*.

### THE FIRST AMENDMENT CLAIM

On December 17, 1964, plaintiff was offered and thereafter accepted a temporary research-teaching position as Assistant Professor of Labor Studies at Penn State for the period from February 1 to June 30, 1965. On June 8, 1965, plaintiff accepted a 42-week appointment as Assistant Professor of Labor Studies, effective July 1, 1965. This was a provisional appointment with no prior academic service credit toward tenure. On April 7, 1966, plaintiff was notified that he would have earned one year of credit toward tenure as of July 1, 1966. On April 12, 1968, plaintiff was notified that he would have earned three years credit toward tenure as of July 1, 1968. On June 24, 1970, plaintiff was notified by Dean Paulson that he would have earned five years credit toward tenure as of July 1, 1970. Seven years of satisfactory probationary service is required before tenure can be awarded. As was customary with faculty members who were approaching the seven year, tenure-eligibility mark, Dean Paulson, who ultimately had the responsibility of making the final tenure decision, appointed in May 1971, five senior faculty members to

an *Ad Hoc* Tenure Review Committee to evaluate plaintiff's performance and qualifications and make a recommendation with respect to tenure. While ordinarily the recommendation to the Dean on tenure comes from the department in which the professor teaches, plaintiff was a member of the Department of Labor Studies, a new department at the University concerned with a relatively new academic discipline. The Department of Labor Studies lacked the necessary tenured senior faculty members to provide a properly constituted tenure review committee. Thus, as was the established practice at Penn State in such cases, Dean Paulson appointed an *ad hoc* interdisciplinary tenure review committee, selecting its members on the basis of their academic and leadership experience and their professional backgrounds, and *without regard* for their political beliefs or philosophical predilections. Professor Golatz, plaintiff's department chairman, did not object to the appointment of the *ad hoc* committee in May 1971. Dean Paulson submitted to the *ad hoc* committee all the information concerning plaintiff which the University had, including all the material submitted by Professor Golatz. Professor Golatz recommended tenure for plaintiff but conceded in the recommendation that plaintiff is generally "impatient and imprudent." Professor Golatz had previously declined to recommend plaintiff for promotion from assistant to associate professor status even though 80% of the Penn State faculty members have achieved associate professor status before being awarded tenure and even though the average time for receiving the promotion to associate professor in the College of Arts and Sciences is four and one-half years. Plaintiff had been an assistant professor for approximately six years.

The *ad hoc* committee reached its decision without interference by Dean Paulson, to whom its recommendation was to be made and who, as was his custom, was prepared to accept the recommendation of such a committee. At no time did Dean Paulson discuss with the *ad hoc* committee plain-

tiff's political or other extramural activities or his support of organizations or groups. Nor did Dean Paulson or any other member of the University suggest to the committee in any manner what decision they should reach. Indeed, the existence and actual membership of the committee was known only to the five committee members, who agreed the membership of the committee would be confidential, and to Dean Paulson and President Oswald. The committee was free to seek any additional information it desired.

The *ad hoc* committee was an interdisciplinary group of five senior tenured professors who were chosen on the bases of their acknowledged scholarship in departments in the social sciences with which the interdisciplinary Labor Studies program is related and their experience in evaluating faculty members for tenure and academic advancement. The committee consisted of: Robert K. Murray, Professor of American History; Grant Farr, Professor of Economics; Robert Friedman, Professor of Political Science; Gordon DeJong, Professor of Sociology; and Carroll C. Arnold, Professor of Speech Communication. This committee based their evaluation of plaintiff on the usual academic criteria of teaching performance, research and publication, continuing education activities, service to the University, and scholarship and professional growth. After carefully evaluating plaintiff's performance and accomplishments in each of these categories, the committee *unanimously* concluded as follows: "It is therefore the committee's collective opinion, after careful examination, discussion, and deliberation, that the overall performance of Dr. Wells Keddie has been below the minimum it deems necessary for retention as a tenured staff member." While the committee's assessment of plaintiff's work in continuing education was favorable, their evaluation of teaching effectiveness was partially favorable and partially unfavorable, their evaluation of publications and research, of scholarship and professional growth were unfavorable, and service to the University was considered minimal.[1] In

---

1. For a complete statement of the reasons set forth by the *ad hoc* committee for its decision to recommend tenure denial, *see* the text of the committee's final report to Dean Paulson in the appendix at the end of the memorandum.

short, faculty tenure is conferred at Penn State as an award for excellence, and the *ad hoc* committee found that plaintiff's performance was not outstanding. A professor's work and qualifications must exceed mere competence to justify an award of tenure and hence permanent employment at Penn State.

■ Plaintiff asserts that the *ad hoc* committee in reaching its decision impermissibly penalized him for his political and other extramural activities. Plaintiff was an active participant in political and student causes. He was a vocal critic of some policies of the United States Government, particularly its involvement in Vietnam and its social policies with respect to blacks, the poor, and other disadvantaged groups. Plaintiff believed that the Penn State administration was insensitive to the needs and demands of students and blacks, and he was a strong advocate of giving students a greater role in the governance of the University. He helped to organize and participated in protest activities directed at the University administration as well as the United States Government. He served as faculty adviser to Students for a Democratic Society and to the *Ad Hoc* Committee for Student Rights. He served as counsel for students charged with violating University rules before the Judiciary Board. He was an active participant in the Vietnam teach-in, Mayday anti-war rally, moratorium days, and other Vietnam protest activities. He was a member of such organizations as Coalition for Peace, Citizens Against Capital Punishment, Union for Radical Economics, Union for Radical Political Economy, and the Executive Council of the New University Conference. Plaintiff participated in the activities on the Penn State campus directed at ending the war in Southeast

Asia, ending alleged racism in the United States, and in numerous campus movements directed at changing the situation of students at Penn State. He acted as counsel to students, spoke at student meetings and rallies, acted as a mediator in campus disputes, and raised bail money for students in jail. He was openly critical of the Penn State administration for many of its policies and for the failure of the University to become actively involved in social and political causes he deemed just. Plaintiff was a controversial figure on campus as a result of these activities. Plaintiff, however, has not proven that these activities affected in any manner the tenure denial decision reached by Penn State.[2]

The court finds that the preponderance of the evidence clearly shows that the *ad hoc* committee, as well as Dean Paulson, regarded plaintiff's personal activities in the political realm and his other extramural activities [3] *as having no effect,* either favorable or unfavorable, on their tenure evaluation of him and on his academic status at the University. As stated in the *ad hoc* committee's final report on tenure:

"From the beginning, the committee considered Dr. Keddie's personal political beliefs as irrelevant to its examination unless such beliefs could be shown to have a detrimental effect on his academic performance. The committee did not find any demonstrable definitive connection between the two. On the other hand, the committee did not regard personal beliefs as having a positive effect on performance. That is, the committee regarded Dr. Keddie's personal activities in the political realm as having no more or less valuable or invaluable effect on his academic status as activities by other faculty members on behalf of the Repub-

**2.** Only two members of the *ad hoc* committee—Professors Robert Murray and Grant Farr—were called to testify by the plaintiff. Professor Murray and Professor Farr both stated that plaintiff's political and other non-academic activities had no effect, favorable or unfavorable, on the committee's deliberations and decision. Rather the committee based its decision solely on the traditional academic criteria,

as set forth in the committee's final report to Dean Paulson, *see* footnote 1 and appendix.

**3.** "Extramural" activities is used to refer to personal, as opposed to academic, activities of the plaintiff undertaken outside the employment relationship.

lican or Democratic parties, or on behalf of church denominations, etc. . . . ”
*See* plaintiff's exhibit No. 17.

The court finds that the committee in fact disregarded plaintiff's political and other extramural activities in the manner set forth above.

In short, the *ad hoc* committee did not base its decision to recommend denial of tenure in whole or in part on plaintiff's extramural activities. The court finds that after a thorough and impartial study of plaintiff's performance and qualifications, specifically his scholarship and professional growth, service to the University, continuing education activities, research and publications, and teaching performance, the committee *unanimously* decided that plaintiff's academic performance had been below the minimum necessary for retention as a tenured staff member. Dean Paulson's decision to deny tenure to plaintiff was based solely upon the *ad hoc* committee's recommendation and the reasons the committee set forth in support of that recommendation. *See* plaintiff's exhibit No. 17; defendants' exhibit No. 1. Thus, the court holds that plaintiff's discharge was not predicated even in part on his exercise of first amendment rights. The evidence shows that the tenure denial has a rational basis.

■ Having found that the defendants did not rely in whole or in part on constitutionally impermissible factors or criteria in reaching the tenure decision and that the decision has a rational basis, this court should not and will not undertake a *de novo* review of plaintiff's academic performance and qualifications. This court is powerless to substitute its judgment for that of the University as to whether plaintiff's academic credentials are such that tenure should have been awarded. The judiciary is not qualified to evaluate academic performance. The courts do not possess the expert knowledge or have the academic experience which should enlighten an academic committee's decision. The courts will not serve as a Super-Tenure Review Committee. *See Chung v. Park,* 3 Cir. 1975, 514 F.2d 382;

*Skehan v. Board of Trustees of Bloomsburg State College,* 3 Cir. 1974, 501 F.2d 31, 40; *Clark v. Holmes,* 7 Cir. 1972, 474 F.2d 928; *Johnson v. Branch,* 4 Cir. 1966, 364 F.2d 177, 181; *Simard v. Board of Education of Town of Groton,* 2 Cir. 1973, 473 F.2d 988. Thus, plaintiff's contentions that the *ad hoc* committee did not "properly evaluate" his performance and that the committee members were not "qualified" to evaluate his academic performance simply are not cognizable in this action. The tenure decision has a rational basis and the *ad hoc* committee did not predicate its evaluation and decision on constitutionally impermissible factors. That is the extent of this court's power to review the *substance* of the tenure decision.

■ In view of the court's finding that the tenure denial was not based even in part on plaintiff's political and other extramural activities and utterances, the court need not decide which of plaintiff's activities and utterances were indeed protected by the first amendment. The court notes, however, that although academic freedom is a constitutionally protected right, *Healy v. James,* 1972, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266; *Keyishian v. Board of Regents,* 1967, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, 640; *see generally* Van Alstyne, The Constitutional Rights of Teachers and Professors, 1970 Duke Law Journal 841, academic freedom is not a license for uncontrolled expression or activity at variance with established curricular content or job-related procedures and requirements, nor does academic freedom encompass activities which are internally destructive to the proper functioning of the university or disruptive of the educational process. *See Pickering v. Board of Education,* 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; *Roseman v. Indiana Univ. of Pennsylvania, At Indiana,* 3 Cir. 1975, 520 F.2d 1364; *Clark v. Holmes,* 7 Cir. 1972, 474 F.2d 928, 931. First amendment rights must be applied in light of the special characteristics of the environment in the particular case. *See Roseman v. Indiana Univ. of Pennsylvania, At Indiana,* supra. As stated by the Supreme Court in *Pickering v. Board*

*of Education,* 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817:

" . . . At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

Thus, certain legitimate state interests may limit the right of a public employee, specifically the right of a state university professor, to say and do what he pleases: for example (1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the teacher's proper and competent performance of his daily duties; (4) the need to encourage a close and personal relationship between the employee and his superiors, when that relationship calls for loyalty and confidence; (5) the need to maintain a competition of different views in the classroom and to prevent the use of the classroom by a teacher deliberately to proselytize for a personal cause or knowingly to emphasize only that selection of data best conforming to his own personal biases; (6) the need to prevent activities disruptive of the educational process and to provide for the orderly functioning of the university. *See Clark v. Holmes,* 7 Cir. 1972, 474 F.2d 928, 931–932; *Roseman v. Indiana Univ. of Pennsylvania, At Indiana,* 3 Cir. 1975, 520 F.2d 1364; *Simard v. Board of Education of Town of Groton,* 2 Cir. 1973, 473 F.2d 988; *Knarr v. Board of Trustees,* N.D.Ind.1970, 317 F.Supp. 832, *aff'd* 7 Cir. 1971, 452 F.2d 649; *Robbins v. Board of Education,* N.D.Ill.1970, 313 F.Supp. 642, 645–647; *Goldwasser v. Brown,* 1969, 135 U.S.App.D.C. 222, 417 F.2d 1169; *Hetrick v. Martin,* 6 Cir. 1973, 480 F.2d 705; *Johnson v. Branch,* 4 Cir. 1966, 364 F.2d 177; *cf. Arnett v. Kennedy,*

1974, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15; *see generally* Van Alstyne, The Constitutional Rights of Teachers and Professors, 1970 Duke Law Journal 841; Developments In The Law-Academic Freedom, 81 Harvard Law Review 1045 (1968).

## PROCEDURAL DUE PROCESS

Plaintiff contends that his denial of tenure and his discharge without a pretermination hearing is violative of due process.

A pretermination hearing is not a hearing held prior to any decision to terminate, but rather a hearing held prior to the termination of benefits—in this case prior to the actual termination of employment at the end of the final academic year. *Chung v. Park,* 3 Cir. 1975, 514 F.2d 382, 386 & n. 7. The function of the hearing procedure is to inform the professor of the grounds for his non-retention and to allow him to challenge their sufficiency. A post-decision hearing in which the professor has the burden of proof is adequate to satisfy due process. *Perry v. Sindermann,* 1972, 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570, 580; *Chung v. Park,* 3 Cir. 1975, 514 F.2d 382, 387.

Whether plaintiff was entitled to a pretermination hearing is dependent upon whether he had the requisite property interest in continued employment. A professor claiming a constitutionally protectable property interest in continued employment must be able to point to some objective criteria by which the university administration has indicated a willingness to limit its discretion with respect to an otherwise at-will employment relationship. The Supreme Court has held that in the case of government employment a public college professor dismissed from a tenured position, *Slochower v. Board of Education,* 1956, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, discharged during the term of his contract, *Wieman v. Updegraff,* 1952, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, or terminated after receiving a clearly implied promise of continued employment, even though non-tenured and without a formal contract, *Connell v. Higginbotham,* 1971, 403 U.S.

207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418, 420, has an interest that is safeguarded by the due process clause. In *Perry v. Sindermann*, 1972, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570, the Court stated that a professor at a state college has a property interest protected by due process when he has a binding understanding fostered by the college administration—i. e., when the state college has a *de facto* tenure program based on rules or established practices and that in effect the professor had *de facto* tenure under that program. However, in *Board of Regents v. Roth*, 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, the Court held that a public professor who had a mere expectancy of being retained—i. e., a unilateral expectation of it—did not have a property interest protected by the due process clause. Property interests are not created by the Constitution, and whether a state college professor has a right to continued employment is a question of *state* law. *Morris v. Board of Education of Laurel School District*, D.Del.1975, 401 F.Supp. 188, 208–210. As stated by the Court in *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561:

> "*Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.* It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to

those benefits. . . . " (Emphasis supplied.)

The relationship between a state institution and one of its teachers is essentially a matter of state concern and state law. *Board of Regents v. Roth*, supra, at 603–604, 92 S.Ct. at 2717, 33 L.Ed.2d at 580–581 (Burger, C. J., concurring). As noted by the Court in *Epperson v. Arkansas*, 1968, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228:

> "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. . . . " (Footnote omitted.)

█ The court finds that plaintiff lacked an interest in continued employment encompassed within the fourteenth amendment's protection of property. Plaintiff had only a subjective expectancy of continued employment, not an objective expectancy based on a specific or implied contract right, a statutory entitlement, *see Travis v. Teter*, 1952, 370 Pa. 326, 336–337, 87 A.2d 177, or a *de facto* tenure system. Penn State has an established system for awarding tenure, *see* plaintiff's exhibits Nos. 64, 66, 67, and for the legitimate reasons set forth previously, plaintiff was denied tenure under that system. Denial of tenure to faculty members at Penn State is not unusual. During Dean Paulson's term as Dean of the College of Arts and Sciences, from 1969 through 1974, tenure was granted to 104 faculty members and denied to 36. Thus, tenure was denied to approximately one-fourth of all faculty members evaluated during this period of time. Plaintiff, like all other nontenured professors at Penn State, did not have an implied promise of an award of tenure at the end of his probationary initial seven years of service. Absent contractual provisions to the contrary,

in the period before tenure eligibility, which arrives after seven years of probationary employment, the professor has an at-will employment relationship with the University or a yearly contract. There is no evidence that plaintiff at any time was promised tenure by the Penn State administration. In short, the terms of plaintiff's employment secured absolutely no interest in permanent tenured status at the University, and the evidence adduced at trial supports no possible claim of entitlement to such status. *See Roseman v. Indiana Univ. of Pennsylvania, At Indiana*, 3 Cir. 1975, 520 F.2d 1364, 1365.

Since plaintiff lacked a property interest protected by the fourteenth amendment, the court holds that he was not entitled to a professional tenure or pretermination hearing.

■ Plaintiff also asserts that the denial of tenure, based as it was on the University's belief that his overall performance was "below the minimum it deems necessary for retention as a tenured staff member," injured his reputation and career in a manner that required Penn State to grant him a hearing in order to clear his name. The purpose of such a hearing is to provide an individual with an opportunity to be heard. Even if a person does clear his name with respect to one charge, his employer is free to deny him future employment for other reasons. *Board of Regents v. Roth*, 408 U.S. at 573, n. 12, 92 S.Ct. at 2707, 33 L.Ed.2d at 558. While a professor's interest in a particular teaching position does not constitute a liberty interest, a professor does have an interest in his ability to pursue his academic career and an interest in his good name which are protected by the liberty assurance of the due process clause. One acting under color of state law may not substantially impair these interests absent procedures appropriate to the various interests involved.

■ The reasons given by Penn State for the tenure denial decision did not make any charges against plaintiff that could seriously damage his standing and associations in the community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, immorality, or illegality. *See*, e. g., *Suarez v. Weaver*, 7 Cir. 1973, 484 F.2d 678; *Morris v. Board of Education of Laurel School District*, D.Del.1975, 401 F.Supp. 188, 210–211; *see also Arnett v. Kennedy*, 1974, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15. The University did not impose a stigma or other disability that foreclosed plaintiff's freedom to take advantage of other employment opportunities. Indeed, plaintiff presently is an associate professor at Livingston College, Rutgers University and was awarded tenure there on July 1, 1974, upon the recommendation of an interdisciplinary faculty committee similar in nature to the *ad hoc* committee at Penn State which evaluated plaintiff's performance.

■ Therefore, while the liberty assurance of the due process clause requires that an individual be given notice and an opportunity to be heard in order to refute the charges where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, *Board of Regents v. Roth*, 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558; *Wisconsin v. Constantineau*, 1971, 400 U.S. 433, 436–437, 91 S.Ct. 507, 509–510, 27 L.Ed.2d 515, 518–519; *see Joint Anti-Fascist Committee v. McGrath*, 1951, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817, the reasons given to plaintiff for the tenure denial clearly do not fall within this category of reasons requiring such a hearing.[4] Denial

---

4. The following is the official and *sole* statement of reasons given by Penn State in support of its decision to deny plaintiff tenure. It should be noted that these reasons were provided *solely* to plaintiff in a confidential letter from Dean Paulson to plaintiff in response to his request for reasons.

"In response to your request of September 14, 1971, for reasons for the negative decision on tenure, the following information is provided.

"An Advisory Committee of five senior professors was appointed to review recommendations on your work in relation to tenure and to make the recommendation to me they considered appropriate. Members of this Committee were chosen on the bases of their acknowledged [sic] scholarship in departments in the social sciences with which

**1274**

of tenure because of poor or, in this case, non-excellent professional performance is not a badge of infamy. *Berry v. Hamblin*, M.D.Pa.1973, 356 F.Supp. 306, 308. As previously noted, plaintiff was denied tenure not on the basis that he was incompetent, but rather on the basis that his level of performance did not meet the standard of excellence set by the University for an award of permanent employment. Mere proof that one's record of nonretention in one job makes him somewhat less attractive to other employers does *not* establish the kind of foreclosure of opportunities or the harm to reputation amounting to the deprivation of "liberty" protected by the due process clause. *Board of Regents v. Roth*, 408 U.S. at 574, n. 13, 92 S.Ct. at 2707, 33 L.Ed.2d at 559; *cf. Schware v. Board of Bar Examiners*, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796. Even a dismissal based on a finding of professional incompetence would not constitute a deprivation of "liberty" under the fourteenth amendment so as to invoke procedural due process. *See Blair v. Board of Regents of State University Com-*

*munity College System of Tennessee*, 6 Cir. 1974, 496 F.2d 322, 324. Moreover, the court finds that plaintiff's nonretention by Penn State did not have a substantial adverse effect on his academic career, as evidenced by his present tenured associate professor status at Rutgers University.

Furthermore, between June 21, 1971, and the filing of this lawsuit, none of the defendants provided any person outside the Penn State administration with the reasons for plaintiff's tenure denial, and within the administration, the reasons were the nonderogatory ones set forth in the *ad hoc* tenure committee's report containing the recommendation to Dean Paulson. It was plaintiff himself who, upon receipt of notice of the tenure denial in June 1971, disclosed this information to many persons both within and without the Penn State community. Plaintiff helped to organize and participated in activities of both faculty and students to protest the tenure decision. He addressed public audiences in the fall of 1971 and in April of 1972 stating *his* opinion as to the reasons for tenure denial[5] and

the interdisciplinary program in Labor Studies is related and their experience in evaluating faculty members for tenure and academic advancement. No member of my College administrative staff was on the Committee. They were asked to carry out their evaluation on the basis of the usual academic criteria including teaching effectiveness, research, continuing education, professional growth, and academic responsibility to the department, college, and university. Information provided to them included copies of teaching evaluations including student evaluations, recommendations from Professor Golatz, Head of the Department, evaluations from Labor Advisory Board members, copies of publications, research reports, personnel actions, and curriculum vitae. The Committee was invited to request any additional materials that would be helpful to them in their evaluation. Subsequent requests were transmitted by me to Professor Golatz, who provided additional information; he was also invited to submit any further materials he thought helpful to the Committee's review.

"After extensive consideration of your accomplishments and potential in relation to the responsibilities of the position in your department, the Committee concluded that the overall performance 'has been below the minimum it considers necessary for retention

as a tenured staff member.' While their assessment of work in continuing education was favorable, their evaluation of teaching effectiveness was partially favorable and partially unfavorable, their evaluation of publications and research, of scholarship and professional growth were unfavorable, and service to the University was considered minimal. In assessing effectiveness, the Committee took into account the major responsibilities this position carries as Research Director of the Department and teaching mostly at the 400-course level, as well as the future needs of the program in meeting such responsibilities.

"In my judgment, the Committee made a very thorough and fair evaluation of your academic accomplishments and future potential for this College. I have therefore approved their recommendation, informed you of my decision in my letter of June 21, 1971, and sent it on to the President to whom the report of all tenure actions within the College is made."

5. On October 4, 1971, Dean Paulson by letter provided plaintiff with the official reasons for the tenure denial decision, reasons which plaintiff apparently was unwilling to accept. *See* footnote 4, supra, for the text of Dean Paulson's letter.

urging those in his audience to exert pressure on the administration to reconsider the decision. In October 1971, plaintiff personally prepared and caused to be published and widely circulated, within and without the Penn State community, a "fact sheet" disclosing the denial of tenure, his qualifications, and his criticism of the procedures used in arriving at the decision. *See* plaintiff's exhibit No. 6. Thus, the evidence shows that the widespread publicity concerning the tenure denial decision, along with any derogatory implications to be drawn therefrom, resulted from the actions of the plaintiff himself, *not* from anything the defendants did or said. In addition, the assumption that the initial "no reason" non-retention decision by the University, plaintiff not having been provided with any official statement of reasons until October 4, 1971, would have been subject to derogatory interpretations by third parties, in the absence of plaintiff's own public speculations on this matter, is not supported by any fact in the record. *See Burdeau v. Trustees of California State Colleges*, 9 Cir. 1974, 507 F.2d 770, 773.

For the foregoing reasons, the court finds that defendants did not impugn the good name, reputation, honor, or integrity of plaintiff and hence did not impair his academic career. Plaintiff failed to demonstrate that his tenure denial for non-excellent performance implicated a "liberty" interest.

Having found that the defendants in denying plaintiff tenure and terminating his employment did not deprive him of an interest in "property" or "liberty" protected by the fourteenth amendment, the court holds that plaintiff was not denied procedural due process.

## CONSPIRACY CLAIM

Plaintiff contends that the defendants conspired to deny him tenure and to terminate his employment in violation of 42 U.S.C.A. § 1985(3). It is clear that plaintiff has failed to prove a cause of action under this section.

Section 1985(3) provides, in essence, a cause of action for conspiracy to deprive a person of the equal protection of the law. Unlike its counterpart 42 U.S.C.A. § 1983, there is no requirement that the deprivation of rights must occur under color of state law. *Griffin v. Breckenridge*, 1971, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338. While "color of law" is not necessary to a Section 1985 action, to present a claim cognizable under 42 U.S.C.A. § 1985 the conspiracy and the acts in furtherance thereof must stem from a "class-based" animus. *Griffin v. Breckenridge*, supra; *Place v. Shepherd*, 6 Cir. 1971, 446 F.2d 1239; *Jacobson v. Industrial Foundation of Permian Basin*, 5 Cir. 1972, 456 F.2d 258; *Westberry v. Gilman Paper Company*, S.D.Ga.1973, 60 F.R.D. 447. In *Griffin v. Breckenridge*, supra, 403 U.S. at 101–102, 91 S.Ct. at 1798, 29 L.Ed.2d 338, 347–348, the Supreme Court made clear that "class-based" motivation is an essential element of a § 1985(3) cause of action:

"It is thus evident that all indicators—text, companion provisions, and legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies. That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others. For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook, 'that Congress has a right to punish an assault and battery when committed by two or more persons within a State.' *Id.* at 485. The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—*by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.* See the remarks of Representatives Willard and Shellabarger, quoted supra, at 1797. *The language*

requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." (Emphasis supplied.) (Footnotes omitted.)

■ The actions taken by defendants against plaintiff were directed only against plaintiff as an individual and not as a member of some class or race. Plaintiff has not proven that he was a member of an identifiable class and that the actions against him were part of a general pattern of discrimination against such a class. Since plaintiff has failed to show the existence of any class-based, invidiously discriminatory animus behind the actions of the defendants which affected him, the court holds that plaintiff is not entitled to relief under 42 U.S.C.A. § 1985(3).

■ In addition, the court notes that the evidence does not support a finding of a conspiracy of any kind among the defendants. Furthermore § 1985(3) requires a conspiracy by two or more separate individuals as distinguished from the collective judgment of two or more individuals of the same entity—in this case, the University. If the challenged conduct is essentially the act of a single entity, there is no conspiracy. A university cannot conspire with itself any more than a person or corporation can.[6] *Serzysko v. Chase Manhattan Bank,* 2 Cir. 1972, 461 F.2d 699, 703; *Dombrowski v. Dowling,* 7 Cir. 1972, 459 F.2d 190, 196; *Baker v. Stuart Broadcasting Company,* 8 Cir. 1974, 505 F.2d 181, 183; *Cohen v. Illinois Institute of Technology,* N.D.Ill.1974, 384 F.Supp. 202; *Ariate Compania Naviera, S.A. v. Commonwealth Tankship Owners, Ltd.,* S.D.N.Y.1970, 310 F.Supp. 416, 421; *cf. Cole v. University of Hartford,* D.Conn. 1975, 391 F.Supp. 888.

## DEFAMATION AND WRONGFUL DISCHARGE

Plaintiff asserts that he was denied tenure and his employment was terminated in a manner which entitles him to damages for defamation and wrongful discharge under Pennsylvania law. This court has the power to adjudicate these pendent state claims under the pendent jurisdiction doctrine. *United Mine Workers of America v. Gibbs,* 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.

■ Turning first to the defamation claim, plaintiff has the burden of proving the defamatory character of a communication, its publication by the defendants, its application to the plaintiff, the recipient's understanding of its defamatory meaning, the recipient's understanding of it as intended to be applied to plaintiff, special harm resulting to plaintiff from its publication, and abuse of a conditionally privileged occasion. 12 P.S. § 1584a; *Corabi v. Curtis Publishing Company,* 1971, 441 Pa. 432, 273 A.2d 899; *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 1962, 408 Pa. 314, 182 A.2d 751. In order to create liability for defamation there must be publication to a person other than the plaintiff. *Harbridge v. Greyhound Lines, Inc.,* E.D.Pa.1969, 294 F.Supp. 1059; Restatement of Torts, §§ 558, 577. With the exception of the letters from the University to plaintiff, there was no communication by the defendants to any person outside the University administration concerning the reasons for tenure denial between June 21, 1971, when Dean Paulson sent the letter to plaintiff informing him of the tenure decision, and the filing of this litigation, except for informational letters sent by the University to three labor officials who had been serving in an advisory capacity to the Labor Studies Department and who had written personal recommendations on plaintiff's behalf, *see* plaintiff's exhibit No. 77.

■ With respect to the letters sent to the three labor advisors—Michael John-

---

6. Since the court has found that the defendants have not violated the constitutional rights of the plaintiff, the court need not decide and does not reach the issue of whether Penn State is a "person" within the meaning of 42 U.S.C.A. §§ 1983, 1985.

son, Charles Guensch, and Harry Boyer—none of these individuals testified, and plaintiff presented no evidence that the recipients understood the letters they received from Dean Paulson as having a defamatory meaning. Moreover, a communication is defamatory only if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Miller v. Hubbard,* 1965, 205 Pa.Super. 111, 207 A.2d 913; Restatement of Torts, § 559. Plaintiff presented no evidence that the letters to the labor advisors had any such effect and the court finds that the content of the three letters, which were identical, cannot be characterized as having a general tendency to have such an effect. *See Miller v. Hubbard,* 205 Pa.Super. at 115, 207 A.2d 913. The pertinent part of the identical letters stated as follows:

"As a result of a thorough review of all aspects of his [Dr. Keddie's] responsibilities and his future potential as a faculty member carried out by senior faculty members in the College of the Liberal Arts, I regret to report that our decision was that tenure should not be accorded him. The decision was based on evaluation of his effectiveness as a faculty member with teaching, research, and other responsibilities on this campus (which constitutes approximately 80% of his duties) rather than his work with the Union Leadership Academy which had a generally favorable reception." Plaintiff's exhibit No. 77.

Likewise, communication among members of the University administration, as evidenced by the *ad hoc* committee's report and recommendation to Dean Paulson, see plaintiff's exhibit No. 17, clearly is not defamatory. Moreover, plaintiff has failed to prove abuse of a conditionally privileged occasion—to wit, the right of an employer to terminate an employee's employment. *See Harbridge v. Greyhound Lines, Inc.,* E.D.Pa.1969, 294 F.Supp. 1059; *DeLuca v. Reader,* 1974, 227 Pa.Super. 392, 323 A.2d 309. The communications within the University administration and to the labor officials who were serving the Labor Studies Department in an advisory capacity were privileged. Said communications were made upon a proper occasion,[7] from a proper motive, in a proper manner and based upon reasonable cause. *See Montgomery v. Dennison,* 1949, 363 Pa. 255, 69 A.2d 520; *Miller v. Hubbard, supra; MacRae v. Afro-American Company,* E.D.Pa. 1959, 172 F.Supp. 184, 187–188, *aff'd* 3 Cir. 1960, 274 F.2d 287.

Furthermore, malice is essential to an action for defamation, *DeLuca v. Reader, supra; Neeb v. Hope,* 1886, 111 Pa. 145, 2 A. 568; *Quinones v. United States,* 3 Cir. 1974, 492 F.2d 1269, 1274, and the court finds that the defendants exercised reasonable care in their evaluation of plaintiff's academic performance and that their conclusion that it did not warrant an award of tenure was not an intentional, reckless, or wanton attempt to defame plaintiff but rather their good faith judgment as to his qualifications. In short, there is no evidence that any of the defendants communicated to others information about plaintiff with a malicious intent to cause harm or embarrassment to plaintiff. Indeed, in contrast to plaintiff, the defendants took great care *not* to publicize the tenure decision. As set forth previously, plaintiff publicized the tenure denial to thousands, participating in the organization and activities of persons to protest the decision and to exert public pressure on the University to change the decision. In addition, defendants did not give currency to any *false* communication about the plaintiff. The University's opinion as to plaintiff's academic performance was reached after careful evaluation,

---

7. Proper occasions, which give rise to a qualified or conditional privilege, can be classified as follows: (1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved; and (3) situations in which a recognized interest of the public is involved. *MacRae v. Afro-American Company,* E.D.Pa.1959, 172 F.Supp. 184, *aff'd* 3 Cir. 1960, 274 F.2d 287; *see* Prosser, Law of Torts § 110 (3d Ed. 1964).

and the conclusion that his overall performance was below the minimum considered necessary for retention as a tenured staff member is a reasonable one. Hence, the defendants have in effect proven the truth of the alleged defamatory communications, which is an absolute defense to an action for defamation. 12 P.S. § 1584a. In short, there is no evidence in the record that any of the defendants communicated *false* information to others about plaintiff or his tenure denial. Plaintiff, rather than the defendants, gave widespread circulation to the *fact* that he had been denied tenure and it was plaintiff, not the defendants, who attributed potentially defamatory reasons to the tenure decision.

For all the foregoing reasons, plaintiff clearly is not entitled to damages for defamation.

Finally, the court turns to plaintiff's contention that he has a cause of action against the defendants for wrongful discharge. For this non-statutory cause of action plaintiff relies on *Geary v. United States Steel Corporation,* 1974, 456 Pa. 171, 319 A.2d 174. Plaintiff's reliance is misplaced.

In *Geary* the Pennsylvania Supreme Court affirmed the dismissal of an action which had been filed by a former salesman against his former employer, a steel manufacturer, for damages for his allegedly wrongful discharge in retaliation for his having pointed out to his superiors the unsafe nature of tubular products for the oil and gas industry, which the steel company later withdrew from the market. Reaffirming the basic principle that unless restrained by contract or statute, a private employer may discharge an employee at pleasure, with or without cause, *Henry v. Railroad Co.,* 1891, 139 Pa. 289, 21 A. 157; *McKinney v. Armco Steel Corporation,* W.D.Pa.1967, 270 F.Supp. 360, the *Geary* court stated that unless a clear mandate of public policy is violated—such as dismissal for refusal to commit perjury, *Petermann v. International Brotherhood of Teamsters,* 1959, 174 Cal.App.2d 184, 344 P.2d 25, or solely for exercising a statutorily conferred right, such as filing for workmen's compensation benefits, *Frampton v. Central Indiana Gas Co.,* Ind.Supreme Ct.1973, 297 N.E.2d 425—either party has the power to terminate an employment relationship for any or no reason. As pointed out by the *Geary* court, this power of termination is explicitly recognized in the Restatement of Torts, § 762, which states the following:

"§ 762. PRIVILEGE OF SELECTING PERSONS FOR BUSINESS RELATIONS.

One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not

(a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or

(b) a means of accomplishing an illegal effect on competition, or

(c) part of a concerted refusal by a combination of persons of which he is a member."

Thus, the court in *Geary* refused to create a general non-statutory cause of action for an employee whose employment was terminable at will and who was discharged for an unjustifiable reason or no reason at all.

In the case *sub judice,* plaintiff's employment was not terminated for the specific purpose of causing him harm, to achieve a goal proscribed by public policy, or for any other ulterior purpose. He was denied tenure for legitimate reasons. As the *Geary* court stated, the fact that some degree of harm is generally foreseeable whenever an employee is dismissed does not justify the creation of a new non-statutory tort for wrongful discharge. Thus, plaintiff obviously does not have a state cause of action for wrongful discharge.

Plaintiff's request for declaratory and injunctive relief and for damages will be denied.

The foregoing shall constitute the court's findings of fact and conclusions of law.

APPENDIX

THE PENNSYLVANIA STATE UNIVERSITY
INTER-OFFICE CORRESPONDENCE

Date:  May 28, 1971

From:  Robert K. Murray, chairman of Dean's Ad Hoc Tenure Review
Committee

To:  Dean Stanley Paulson

The committee, composed of Gordon DèJong, Carroll Arnold, Grant Farr, and Robert Friedman, met six times between May 17 and May 28.  Each session, except the last, involved one and one-half hour's deliberation.  After opening remarks by the Dean at the first session, the committee discussed and established the following procedures.

1) The membership of the committee would be confidential and no independent discussions with others would be held concerning the case at hand
2) Any requests for additional information would be handled through the Dean's office only
3) Each committee member would read carefully all the available documents, research reports, publications, and dissertation materials
4) Following the thorough and open discussion of all pertinent matters, any final decisions would be reached by written and secret ballot.  Each member would be expected to make a positive, neutral, or negative evaluation of each of the following categories:
    a. Teaching performance
    b. Research and publications
    c. Continuing Education activities
    d. Service to the University
    e. Scholarship and professional growth
5) The results of the balloting on each category would be reported to the Dean by the chairman
6) A summary written report of the committee's proceedings and deliberations would be written by the chairman and given to the Dean, with copies also given to each committee member.

In its deliberations the committee constantly had difficulty in arriving at a satisfactory weighting formula for the various categories listed above.  Moreover, it was somewhat confused by the exact nature of this department (Labor Education) and its precise mission.  Also, it was hazy about the intended development and future prospects for this academic enterprise.  On one occasion (May 26) the committee invited the Dean to give his views on these matters in order to arrive at clearer guidelines.  In any event, the committee felt that its assessment of the tenure case in question was also related in a general way to its assessment of the labor education activity as a whole, and to the way in which that activity fitted into the mission of the College of Liberal Arts.  At all times, it must be admitted, the committee felt somewhat

uneasy in wrestling with these "weighting" and "mission" matters, especially as they related to the particular performance of Dr. Wells Keddie.

Teaching:

The committee reviewed the teaching assignments, class size, grade distributions, student evaluations, supervisor evaluations, and other such pertinent data concerning teaching. It found some of the evaluations to be good, but also noted adverse comments as well. The committee observed a somewhat slip-shod attitude by Dr. Keddie toward teaching responsibilities, such as class attendance, and a disinclination to use the grading system as normally applied. There was evidence that Dr. Keddie both stimulated and repelled—that is, he tended to polarize his students. Some believed they were subject to indoctrination and that there was a lack of a dispassionate view. The committee was unable to arrive at a clear conception to the quality of the work taught. Since he has been teaching mainly at the 400 level, the committee looked at his teaching performance in that light. The committee was concerned that the class atmosphere was not always conducive to "open" discussion and that a certain pre-selection of students tended to occur which created pressures within a class that were not always academically productive. Many of these students, however, were laudatory of Keddie and gave him high marks as a teacher. He, on the other hand, rarely gave a C, no D's or F's, and a very high percentage of A's.

Publications and Research:

The committee read carefully all of the evidence regarding research and publication:

1) Dissertation "Democratic Behavior and Union Bargaining Power"
2) Article, "Union Democracy—Again," in Western Economic Journal
3) Report, "Impact of the Union Leadership Upon . . . Union Members"
4) Report, "Survey of New Members . . . ."
5) Revised Chapter (from above-mentioned dissertation)
6) Draft of accepted article, "Fish and Futility in Iranian Development"

The committee believed the candidate gave evidence of being able to do scholarly work. It felt the dissertation was of a reasonable quality, and was relatively well-executed. However, it found the other pieces of work deficient in a variety of ways. Neither the published article nor the accepted article represent more than minimum competency; indeed, it was generally agreed that the "Union Democracy—Again" article was below normal minimum publishing standards. The two reports were found to be deficient in design, method, implementation, and, in the case of one, in conclusions. The committee believed that in some respects Dr. Keddie is a victim of his own insistence of defining problems in ways that take him into areas of the social sciences, as well as into areas of economics, where he has only a superficial knowledge or skill. Moreover, the committee observed that his title is "Research Director," yet his performance and his productivity hardly justify such a title. Also, his ability to conduct in-depth studies relating to programs and instruction is marginal, to say the least. The committee also noted that his department head was not recommending him for promotion to associate professor at this time because of his obvious deficiencies in scholarly publications.

## Continuing Education:

The committee found this aspect of Dr. Keddie's activities to be his strongest suit. The committee regarded the two syllabi that were given to it to evaluate as being rather impressive. While many of the letters regarding his continuing education performance were relatively perfunctory, there was one that was out of the ordinary and commanded the committee's attention. Dr. Keddie seems to be well-liked by those who worked with him in these various programs. The unions apparently are satisfied with his work. The committee felt that the one major criticism made earlier against Dr. Keddie, relating to combining the union and student movements, needed further proof and therefore the committee disregarded it.

The committee wished that it had been able to receive feedback from the students themselves who were in the various seminars. As it was, it had to rely on testimony from union officials only. What evidence it saw was favorable to Dr. Keddie.

## Service to the University:

From the beginning, the committee considered Dr. Keddie's personal political beliefs as irrelevant to its examination unless such beliefs could be shown to have a detrimental effect on his academic performance. The committee did not find any demonstrable definitive connection between the two. On the other hand, the committee did not regard personal beliefs as having a positive effect on performance. That is, the committee regarded Dr. Keddie's personal activities in the political realm as having no more or less valuable or invaluable effect on his academic status as activities by other faculty members on behalf of the Republican or Democratic parties, or on behalf of church denominations, etc. Therefore, the committee observed with some surprise what both Dr. Keddie and his own department regarded as "service to the University." The committee did not consider membership on the New University Conference or speeches given on moratorium days as falling under the category of "service to the University." These result from personal decisions and persuasions, and not from institutional obligations. Nor did the committee regard panelist appearances on WDFM or radio interviews as constituting service to the University. It did consider Dr. Keddie's brief stint on the Faculty Affairs Committee of the College of the Liberal Arts, and his activities as faculty adviser to SDS as constituting such service. Within this framework, the committee found Dr. Keddie's "service to the University" to have been minimal.

## Scholarship and Professional Growth:

It was in this category, and in Research and Publications, that the committee found Dr. Keddie to be weakest. The committee believed Dr. Keddie's scholarship, and his potential for growth, to be below average. He seems to have no significant research in progress and he evidences no inclination to begin anything truly "new." It seems obvious that research and scholarship is something he feels he "has to do" and is not something that "he likes to do." His latest article seems to be no more sophisticated than his first and consists of data collected some years ago. He seems to have acquired no additional skills either in research or in evaluative techniques. He appears to be inactive in both regional and national professional associations.

### CONCLUSIONS

At its final meeting on May 28, the committee proceeded to ballot on the first four categories, reserving the last category as a general summation or evaluation of Dr. Keddie's performance to date, together with an assessment for the future.

The results were as follows:

|  | Minus | Neutral | Plus |
|---|---|---|---|
| On teaching: | 1 | 3 | 1 |
| On publications & research: | 5 | 0 | 0 |
| On continuing education: | 0 | 1 | 4 |
| On University service: | 3 | 2 | 0 |
|  | 9 | 6 | 5 |

On the general summation category of scholarship and professional growth the result was as follows:

| Minus | Neutral | Plus |
|---|---|---|
| 4 | 1 | 0 |

It is therefore the committee's collective opinion, after careful examination, discussion, and deliberation, that the overall performance of Dr. Wells Keddie has been below the minumum it deems necessary for retention as a tenure staff member.

Robert K. Murray

The individual ballots are attached for your information.