Ana Maria DOMINGUEZ,
Plaintiff-Appellant,

v.

Abraham D. BEAME, Individually and in his official capacity as Mayor of the City of New York, and his successors in office, Michael J. Codd, Individually and in his official capacity as Commissioner of the Police Department of the City of New York, and his successors in office, Sidney Baumgarten, Individually and in his official capacity as Assistant to the Mayor of the City of New York and as Chairman of the Midtown Law Enforcement Coordinating Committee, and his successors in office, the Police Department of the City of New York, Sylvester Bonarti, Individually and in his official capacity as a police officer of the City of New York, Francis Colletti, Individually and in his official capacity as a police officer of the City of New York, Defendants-Appellees.

No. 460, Docket 78–7353.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1978.

Decided June 28, 1979.

Harlon L. Dalton, Legal Action Center of the City of New York, Inc., New York City (Deborah M. Greenberg, Legal Action Center of the City of New York, Inc., New York City, of counsel), for plaintiff-appellant.

L. Kevin Sheridan, Asst. Corp. Counsel, New York City (Allen G. Schwartz, Corp. Counsel, Judith A. Levitt, Asst. Corp. Counsel, New York City, of counsel), for defendants-appellees.

Before TIMBERS and MESKILL, Circuit Judges, and DOOLING, District Judge.*

MESKILL, Circuit Judge:

We are asked to reverse a judgment entered in the United States District Court for the Southern District of New York, Charles M. Metzner, *Judge*, dismissing an action brought under 42 U.S.C. § 1983 and the Fourteenth Amendment against the Police Department of the City of New York as well as various New York City officials and employees. The substance of the complaint was that appellant had been arrested for "status" rather than conduct, that she had been arrested without probable cause, and that she had been subjected to what she calls "summary punishment," that is, that the police had arrested her knowing that she would never be prosecuted. We affirm the judgment of the district court, although for reasons somewhat different from those relied on by the district judge.

Until 1973, women who were suspected by the New York City police of being engaged in prostitution-related activities, but against whom an arrest for prostitution could not be sustained, were arrested for "loitering." The statute that defined this offense read as follows:

A person is guilty of loitering when he:

. . . . .

6. Loiters, remains or wanders in or about a place without apparent reason and under circumstances which justify suspicion that he may be engaged or about to engage in crime, and, upon inquiry by a peace officer, refuses to identify himself or fails to give a reasonably credible account of his conduct and purposes . . . . .

New York Penal Law § 240.35(6). The New York Court of Appeals declared this statute unconstitutional in *People v. Berck*, 32 N.Y.2d 567, 347 N.Y.S.2d 33, 300 N.E.2d 411, *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 505 (1973). *See also United States ex rel. Newsome v. Malcolm*, 492 F.2d 1166 (2d Cir. 1974), *aff'd*, 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975). After the *Berck* decision, the New York City police began the practice of arresting women they suspected of soliciting for purposes of prostitution for violations of New York's "disorderly conduct" statute, which reads in relevant part as follows:

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

. . . . .

5. He obstructs vehicular or pedestrian traffic . . . . .

* Hon. John F. Dooling, Jr., United States District Judge for the Eastern District of New York, sitting by designation.

New York Penal Law § 240.20(5). This practice apparently ceased in 1976, when the New York legislature enacted a statute entitled: "Loitering for the purpose of engaging in a prostitution offense." New York Penal Law § 240.37. This statute became effective on July 11, 1976, the day before the opening of the Democratic National Convention in New York City, and has been held constitutional by the New York Court of Appeals. *People v. Smith*, 44 N.Y.2d 613, 407 N.Y.S.2d 462, 378 N.E.2d 1032 (1978). Because the arrest in this case took place in November of 1975, it is the "disorderly conduct" statute with which we are concerned today.

Arrests of suspected prostitutes on charges of "disorderly conduct" came to be known as "dis-con-pros" arrests. From the record as it stands,[1] it appears that virtually all of the suspected prostitutes who were arrested for "disorderly conduct" were released the next morning as a result of the district attorney's decision not to prosecute. The only exceptions to this practice appear to have occurred when an additional charge was lodged against the arrestee or when an outstanding warrant for the arrestee was discovered. This process of dismissing "dis-con-pros" arrests was known as "343-ing," the number referring to the form used by the district attorney's office to formalize the decision. The record also shows that the supervising officers and certain specific police officers in the 20th precinct, the precinct involved in this case, knew and understood that most if not all of the "dis-con-pros" arrests effected in the 20th precinct would be "343-ed" by the district attorney.

As to the specific arrest at the center of this appeal, the district court made the following findings of fact, which we cannot characterize as clearly erroneous. Fed.R. Civ.P. 52(a). New York City police officers Sylvester Bonarti and Francis Colletti were assigned to the midnight to 8:00 a.m. shift on November 8, 1975. While patrolling along Broadway in Manhattan they were flagged down by a gentleman who complained to them about being "hassled" by a woman as he walked down the street. He pointed ·to the appellant. The officers pulled over to the side of the street so that they could make their own observations of what was taking place. During the next few minutes, the appellant twice stopped male pedestrians and engaged them in brief conversations. Each of the men eventually walked away. She also spoke to someone in a car parked near the corner of Broadway and 84th Street. At that point, Officer Bonarti got out of the patrol car and placed the appellant under arrest. She was charged with "disorderly conduct." The arrest form filled out by the officers indicates that appellant was arrested because she "engaged various unknown males in conversation thereby causing an inconvenience to vehicle and pedestrian traffic." Although the final typed version of the arrest form indicates that appellant was "[u]nemployed," the earlier handwritten version lists her occupation as "street walker." While appellant was being detained at the station house, an outstanding warrant for her arrest was discovered. The precise nature of the warrant, apparently dated June 9, 1975, is unclear from the record. The next morning, apparently without there having been any discussion with the arresting officers regarding the sufficiency of the evidence to support the arrest or the conviction of appellant for "disorderly conduct," her arrest was "343-ed."

On March 6, 1976, a complaint was filed in the Southern District by the appellant individually "and on behalf of all others similarly situated." The named defendants were the Police Department of New York City, the Mayor and Assistant Mayor, the Commissioner of the Police Department, and the two arresting officers. The defendants other than the Police Department were sued both individually and in their official capacities. The substance of the

---

1. We decline to reverse the evidentiary rulings made by the district court regarding the admissibility of certain documents. Our decision today rests upon our reading of the documents that were admitted into evidence and our review of the transcripts and papers submitted to the court.

complaint was that the appellant had been arrested not for conduct but for "status," that she had been arrested without probable cause, and that she had been subjected to "summary punishment" in violation of due process of law guarantees. On November 21, 1977, the district judge denied class certification, a decision not challenged on this appeal. The district court issued its decision on the merits on June 21, 1978. It is the appeal from this decision that we consider today.

The district court held that appellant had been arrested without probable cause, basing that holding on judicial interpretations of the predecessor to the then effective "disorderly conduct" statute, § 722 of the New York Penal Law of 1909. *See, e. g., People v. Nixon*, 248 N.Y. 182, 161 N.E. 463 (1928); *People v. Carcel*, 3 N.Y.2d 327, 165 N.Y.S.2d 113, 144 N.E.2d 81 (1957). *See also* Practice Commentary to § 240.20 (McKinney 1967). Thus, the district court held, the appellant's civil rights were violated insofar as she was arrested without probable cause. However, the district court determined that appellant was not entitled to the relief requested. The court dismissed the complaint as to the Mayor and the Assistant to the Mayor because appellant "failed to link [them] to [her] arrest . . . ." The appellant expressly declines to contest this dismissal on appeal. As to the arresting officers, the court held that, despite the fact that they had violated appellant's rights, they had satisfactorily established a good faith defense, citing *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339 (2d Cir. 1972) (on remand). This portion of the complaint was dismissed as to them. As to the Police Department and the Police Commissioner, the district court held that, assuming that these two defendants could be held responsible for the unlawful arrest of the appellant, they too were entitled to a good faith defense and that they had satis-

fied the requirements of that defense. Thus, this portion of the complaint was dismissed as to them as well. With regard to the claim that the defendants should be held responsible for subjecting appellant to "summary punishment" in violation of the due process clause, the district court reasoned:

It would seem that a policy refusal by a district attorney not to prosecute persons arrested for disorderly conduct does not rise to the level of summary punishment of those nevertheless arrested by the police. First, it is the duty of police officers to carry out their enforcement duties. If the district attorney refuses to follow through with prosecution, that is his responsibility, for which he may be held answerable in other forums. Second, district attorneys in other counties within the city were prosecuting these cases and it would create an anomalous situation to have a single police department enforcing the same law in different ways in different portions of the city.

Accordingly, the district court declined to grant to the appellant the requested declaratory, injunctive and monetary forms of relief and dismissed the action in its entirety.

DISCUSSION

█ Section 1983 of Title 42 of the United States Code[2] provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Su-

---

2. In light of *Turpin v. Mailet*, 591 F.2d 426 (2d Cir. 1979) (on remand), we need not consider appellant's complaint insofar as it attempts to state a cause of action directly under the Fourteenth Amendment.

preme Court held that this statute was intended to cover "legal as well as natural persons," so it is clear that all of the named defendants can be properly sued under § 1983 for violations of civil rights. The question before us now, however, is not whether these defendants have been properly sued, but whether they may properly be held liable for the unlawful arrest of the appellant.[3] We hold that they may not be.

The Supreme Court explained in *Monell* that:

> Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.

436 U.S. at 690–91, 98 S.Ct. at 2035–36 (footnote omitted). The Court cautioned, however, that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature *caused* a constitutional tort." 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis added). Accordingly, a municipality may not be held liable under § 1983 on a *respondeat superior* theory.

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may

fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. 436 U.S. at 694, 98 S.Ct. at 2038. In other words, in order for a governmental entity to be liable "for its own violations," 436 U.S. at 683, 98 S.Ct. 2018, the plaintiff in a § 1983 action bears the burden of showing first that the governmental entity maintained or practiced an unconstitutional or unlawful "policy" or "custom," *see also Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 405 n. 29, 99 S.Ct. 1171, 1179, n. 29, 59 L.Ed.2d 401 (1979), and second that that policy or custom "caused" or was the "moving force" behind the violation, *see also Rizzo v. Goode,* 423 U.S. 362, 370–71, 375, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

■ Using this analysis, we think it is quite plain that the Police Department should not be held liable for the violations of the appellant's rights that were either alleged or demonstrated. As found by the district court, "[t]he evidence in this case is clear that although there was a policy to arrest women suspected of being prostitutes on the charge of disorderly conduct, the policy was to arrest only those women actually observed engaging in activity which the police in good faith believed constituted an offense." This disposes of the appellant's argument that she was arrested for her "status;" the record shows that she was arrested for her conduct. *Compare Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968); *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). This also disposes of appellant's claim that the Department should be held liable for the fact that she was arrested without probable cause. There was no departmental policy, and there was no showing of a departmental custom, to arrest suspected prostitutes under the "disorderly conduct" statute in the absence of probable cause. The fact that the police officers actually did arrest the appellant without

---

**3.** The appellees have not persuaded us that the district court's conclusion in this regard was error. Accordingly, we base our decision today

on the assumption that appellant was arrested without probable cause.

probable cause is a matter to be considered in connection with the officers' individual liability for that arrest, not in connection with the Department's liability. As to the "summary punishment" aspect of the appellant's complaint, we note initially that her detention was not typical of what she alleges was the practice being engaged in. An outstanding warrant for her arrest was discovered while she was in custody. Thus, it cannot be said that her detention was based solely on the "dis-con-pros" arrest to which she had been subjected. Moreover, we join the district court in hesitating to hold the Department liable for policy decisions made by a separate unit of the city's governmental structure—the district attorney's office. The Police Department is responsible for arresting persons who appear to be violating the law, as long as there is probable cause to believe that they are doing so. It would not only be unfair to hold the police department responsible for the failure of the district attorney to prosecute, it would also create the oddest of situations—police officers would be required to arrest persons for "disorderly conduct" in some areas of the city but not in others, depending upon the practices of the individual district attorneys. Whatever "summary punishment" appellant was subjected to here, *see Menard v. Mitchell,* 139 U.S.App.D.C. 113, 121, 430 F.2d 486, 494 (1970), the responsibility for it is not fairly attributable to the Police Department.

█ As to defendant Codd, then the Commissioner of the New York City Police Department, virtually the same considerations dictate the same result—dismissal. Again reverting to the findings of fact by the district judge, "[t]here is nothing in this case to indicate that anyone higher in the Police Department than Chief Inspector McCarthy [4] was aware of the policy involved in this action," meaning the policy of arresting suspected prostitutes under the "disorderly conduct" statute. Moreover, even if he had known about it, indeed, even if he had been responsible for it, there is nothing unlawful about the policy that existed—arresting persons for "disorderly conduct." And, as with the Department itself, even assuming that appellant was subjected to "summary punishment," there is nothing in the record to justify assigning responsibility for that action to Commissioner Codd. The dismissal of "disorderly conduct" arrests was solely a matter for the district attorney.

█ As far as the individual arresting officers are concerned, we see no basis for overturning the district court's finding that they acted in "good faith" when they placed the appellant under arrest. In defining the good faith defense that may be asserted by police officers when they are sued for having effected an arrest without probable cause, this Court has stated:

[T]o prevail the police officer need not allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a

4. McCarthy is a high-ranking officer in what is called the "Manhattan North Area." A Captain McCabe was the commanding officer of the 20th Precinct, in which appellant was arrested. McCabe was the one who instructed the officers to make arrests of suspected prostitutes when they had reason to believe that they were violating the "disorderly conduct" statute. McCabe sent a copy of his order to McCarthy who responded by sending a copy of a memorandum from Isabel Wood, then Legal Advisor to Manhattan North. Wood's memo indicated that arrests for "status" were illegal and that the implementation of McCabe's order would therefore be illegal. She also indicated that an arrest with knowledge of inevitable dismissal would be unlawful. McCabe asked McCarthy for advice, and McCarthy said to go ahead with the arrests as long as the proper observations of conduct were made and documented.

matter of common sense, a law enforcement officer is entitled to this protection. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra,* 456 F.2d at 1348. Judge Lumbard explained the contours of this defense in the following fashion:

> If the complaint states a cause of action and the plaintiff adduces substantiating proof, the defendant will have to disprove the allegation that he acted without probable cause, or show that, in any event, he acted in good faith and with a reasonable belief in the validity of the arrest and search.
>
> Ordinarily when a suit of this type is brought a court will already have determined that there was no probable cause for the arrest and search complained of. Nevertheless the agent has a complete defense if he can convince the trier of the fact that he acted in good faith and that it was reasonable for him to have believed that the arrest and search were lawful. Thus there are two standards to be considered. The first is what constitutes reasonableness for purposes of defining probable cause under the fourth amendment for the protection of citizens against governmental overreaching. The other standard is the less stringent reasonable man standard of the tort action against government agents. This second and lesser standard is appropriate because, in many cases, federal officers cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves. It would be contrary to the public interest if federal officers were held to a probable cause standard as in many cases they would fail to act for fear of guessing wrong. Consequently the law ought to, and does, protect government agents if they act in good faith and with a reasonable belief in the validity of the arrest and search.

*Id.* at 1348–49 (Lumbard, J., concurring). *See also Jaroslawicz v. Seedman,* 528 F.2d 727, 732 (2d Cir. 1975); *Laverne v. Corning,* 522 F.2d 1144, 1147–48 (2d Cir. 1975). *See generally* Newman, Suing the Lawbreakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcers' Misconduct, 87 Yale L.J. 447, 459–62 (1978).

We decline to overturn the district court's finding that the officers acted in subjective good faith, based as it is on a determination of witness credibility, and we find it reasonable for the officers to have believed that the conduct engaged in by the appellant gave them sufficient reason to place her under arrest for "disorderly conduct."

The New York Court of Appeals described the determination of probable cause in the case of *People v. Smith, supra:*

> Probable cause exists where the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed.

44 N.Y.2d at 622, 407 N.Y.S.2d at 467, 378 N.E.2d at 1037. It is our judgment that, for purposes of this § 1983 action, Officers Bonarti and Colletti believed reasonably that this standard had been met. One pedestrian actually stopped them to complain about being bothered by a woman on the sidewalk, and he pointed to the appellant as the perpetrator. And the officers themselves observed the appellant stop pedestrians and engage them in conversations. The fact that the statute here in question had not previously been construed under circumstances similar to those presented by this case supports our conclusion that although there was not in fact probable cause to arrest the appellant on a charge of "disorderly conduct," the arresting officers' belief that there was probable cause was not unreasonable. *Cf. People v. Macbeth Realty Co.,* 63 A.D.2d 908, 910, 406 N.Y.S.2d 298, 299–300 (1978) (Sullivan, *J.,* dissenting) (suspected prostitute arrested and convicted under "disorderly conduct" statute); *People v. Miller,* 90 Misc.2d 399, 394 N.Y.S.2d 1006 (1977) (woman arrested for prostitution pleads to disorderly conduct).

Thus, the officers are not liable for arresting the appellant without probable cause. As with the other defendants, we decline to hold the officers liable for the policy of arresting suspected prostitutes under the "disorderly conduct" statute, that policy being in no way unlawful, and we decline to assign liability to the officers for whatever unlawful "summary punishment" may have been inflicted on the appellant in this case.

The judgment of the district court is affirmed.

DOOLING, District Judge (dissenting in part):

The evidence, it would appear, does not support the trial court's finding that the defendants' Bonarti and Colletti had established a defense of good faith. Leaving to one side the question whether Officer Colletti was sufficiently a participant in rather than a bystander at the arrest, the evidence seems plainly to preclude a finding that the officers could reasonably have believed that the arrest was supported by probable cause. The disorderly conduct statute, Penal Law, § 240.20, subdivision 5, had a settled meaning that went back to the predecessor statute, Section 722, subdivision 2, of the former Penal Law; the statute required that the defendant's conduct be characterized, not by its effect on individuals, but by its public consequence. *E. g., People v. Szepansky,* Steuben Co. 1960, 25 Misc.2d 239, 203 N.Y.S.2d 306 (Gabrielli, J.). Statutory disorderly conduct requires, in the language of *People v. Harvey,* 1954, 307 N.Y. 588, 590, 123 N.E.2d 81, 82 "that the acts charged must be such as are public in character and breach the public peace, or tend to do so . . . ." See also *People v. Chesnick,* 1950, 302 N.Y. 58, 60–61, 96 N.E.2d 87. *People v. Pritchard,* 1970, 27 N.Y.2d 246, 248–249, 317 N.Y.S.2d 4, 265 N.E.2d 532, emphasizes the persistence under the statute in its present form of its limitation to proscription of behavior threatening a breach of the peace or public inconvenience, annoyance or alarm. See also *People v. Canner,* App.Term 1975, 88 Misc.2d 85, 388

N.Y.S.2d 812, aff'd, 1976, 40 N.Y.2d 886, 389 N.Y.S.2d 361, 357 N.E.2d 1016. That is, indeed, clear from the language of the statute: the person charged must have acted

"with intent to create public inconvenience, annoyance or alarm, or recklessly creating a risk thereof."

Officer Bonarti observed no such conduct. Around 1:00 A.M. he saw plaintiff-appellant leaning against a car, saw her beckon to a man who talked to her and then walked away, and, a moment later, saw her walk over to another passing man and speak to him for a moment or so at about the midpoint of the sidewalks that meet at the corner of Broadway and West 84th Street. Officer Colletti's testimony was similar, but he added that he observed plaintiff speaking from the passenger side to someone in a car. A man had earlier complained to the officers of plaintiff's solicitation and had pointed plaintiff out to them, but refused to give his name, and Officer Bonarti testified that the intersection was one frequented by prostitutes. Nothing in this evidence suggests the remotest approach to a breach of peace, or to any public disorder, or threat of it, or, specifically, of obstructing public passage in the street. Officer Bonarti clearly understood the statute. He explained the statute thus:

"So far as I understand that law, it is if someone impedes the flow of vehicular or pedestrian traffic and also causes a public inconvenience, annoyance, then they are in violation of the section."

There was in what the officers testified that they observed nothing of the impeding of public traffic, nothing of threat to public order; the complaint's characterizing the observed conduct as engaging various males in "conversation thereby causing an inconvenience to vehicle and pedestrian traffic" makes it clear that there was no interference with the flow of traffic other than that implicit in any brief conversation between two people meeting on the street.

It might have been wondered whether the officers' action disappointed any expectation of their superiors, but the testimony of Captain McCabe forbids the inference

that officers were expected to arrest without probable cause—despite Captain McCabe's at best ambiguous "Prostitution Roundup" Memorandum of October 21, 1975, and departmental counsel's warning that the Memorandum might be considered discriminatory in punishing some people for behavior that all engage in under the pretense that those arrested are obstructing traffic when there is no traffic to obstruct. *Cf. People v. Nixon,* 1928, 248 N.Y. 182, 187–188, 161 N.E. 463. In any case reliance on superiors' orders would be relevant primarily to the matter of the officers' subjective beliefs. Important as the subjective belief of arresting officers may be on damage issues, the Court has been clear that if the constitutional liberty is to be safe from infringement, the ultimate test must be the objective reasonableness of the arresting officer's belief that the arrest is warranted in law. *Cf. Terry v. Ohio,* 1968, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Pierson v. Ray,* 1967, 386 U.S. 547, 555–557, 87 S.Ct. 1213, 18 L.Ed.2d 288; *Scheuer v. Rhodes,* 1974, 416 U.S. 232, 244–246, 94 S.Ct. 1683, 40 L.Ed.2d 90; *Wood v. Strickland,* 1975, 420 U.S. 308, 321–322, 95 S.Ct. 992, 43 L.Ed.2d 214; *Procunier v. Navarette,* 1978, 434 U.S. 555, 561–562, 98 S.Ct. 855, 55 L.Ed.2d 24. That reasonableness was absent here.

It is concluded that an erroneous standard of reasonable belief was applied to the facts in the district court, and that, in consequence, dismissal of appellant's complaint against the arresting officers was error.