**Jere JONES, Fred Korn and David Massie, Plaintiffs,**

v.

**John W. KNELLER, Individually and as President of Brooklyn College, et al., Defendants.**

Nos. 75 C 1898, 78 C 1780.

United States District Court, E. D. New York.

Dec. 18, 1979.

Alpert, O'Rourke & Albert, New York City, for plaintiffs by Morton Alpert, New York City.

Allen G. Schwartz, Corp. Counsel, New York City, for defendants by Ilene J. Brown, New York City.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiffs are former instructors in the Philosophy Department of Brooklyn College. They have brought these civil rights actions pursuant to 42 U.S.C. §§ 1983 and 1985(3) and the First and Fourteenth Amendments, alleging that they were unlawfully dismissed because of their exercise of constitutionally protected rights. Defendants are officials and instructors of Brooklyn College ("the college"), the City University of New York ("CUNY"), of which the college is a part, and the Board of Higher Education of the City of New York ("BHE"). Plaintiffs seek compensatory and punitive damages, as well as declaratory and injunctive relief.

The amended complaint in No. 75 C 1898 is materially identical to the subsequently filed complaint in No. 78 C 1780, except for the latter's claim against BHE and its officials under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The actions have been consolidated for all purposes and are now before the court on defendants' motion to dismiss the complaints for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), F.R.Civ.P.

At the outset, the court declines to treat the motion as one for summary judgment pursuant to Rule 56, F.R.Civ.P., on the ground that defendants' brief contains facts and arguments outside the complaints. Defendants' intention to move against the complaints under Rule 12(b) is apparent and the motion will be considered accordingly.

In this regard, the issue here is not whether plaintiffs will ultimately prevail but whether they are entitled to offer evidence in support of their claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Lipsky v. Com. United Corp.*, 551 F.2d 887, 895 (2 Cir. 1976). Therefore, all well-pleaded material allegations will be accepted as true and the complaints will be construed in favor of the complaining parties, *Cruz v. Beto*, 401 U.S. 319, 323, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), recognizing that there cannot be a dismissal unless it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46,

78 S.Ct. 99, 2 L.Ed.2d 80 (1957). See generally *Scheuer v. Rhodes, supra*, 416 U.S. at 237, 94 S.Ct. 1683. Applying these standards, we find dismissal appropriate.

The complaints of approximately 40 pages each recite in great detail the series of events that allegedly led to the non-renewal of plaintiffs' contracts of employment and upon which they base their claims of constitutional deprivation. The facts as alleged are related here in greater detail than is our custom since plaintiffs' claims are not readily discernible and, in fact, fall victim of literary excesses which expose the controversy between the parties as nothing more than "mere bickering" among teachers, a claim not recognized to be of constitutional magnitude.

Plaintiffs' allegations, read in their best light, reveal that the underlying disagreement between the parties originated in a difference of opinion over teaching method. Plaintiffs advocated the "journal" method of teaching, which involved periodic grading of students' journals. Defendants, on the other hand, supported the "lecture" method of instruction in which the teacher would have only infrequent examinations to grade and an occasional paper to consider. The journal method allegedly left the teachers less time to pursue scholarly endeavors than the lecture method, which allegedly encouraged the teachers' academic pursuits but sacrificed the interests of the students. Thus, the complaint alleges a fundamental disagreement over the best method of instruction in the college's philosophy department, which plaintiffs contend compelled them to voice criticism of various personalities.

One of the advocates of the journal method was Elmer Sprague, who in 1972 was vice-chairman of the philosophy department. In late spring 1972, the chairman of the department, Martin Lean, made it known that he was going to spend a year at the University of Southern California. Defendants Salvator Cannavo, Paul Edwards, Gertrude Ezorsky, Edward Kent, Arnold Koslow and Paul Taylor, all members of the faculty, feared that if Sprague became chairman in Lean's absence the journal method would be adopted for those teaching in the department. They therefore petitioned defendant John W. Kneller, the president of the college, to conduct an election to fill the acting chairman position. Kneller stated that it was the responsibility of the president to designate an acting chairman but that he would consider the results of an informal election held by faculty members within the department. The informal election resulted in Sprague defeating Kent by a one vote margin, and he was subsequently named acting chairman by Kneller.

During Sprague's tenure as acting chairman, he engaged in various acts which resulted in alienation of the faculty defendants. For example, as acting chairman he was a member of the college-wide personnel and budget committee, which voted on the final recommendations for promotion at the college. Kent failed to receive sufficient votes to be promoted to associate professor. Cannavo, Koslow and Ezorsky all failed to gain sufficient votes to be promoted to full professors. They all blamed Sprague for their failure to gain promotions. In addition, Sprague incurred the wrath of Edwards by insisting on enforcing a school regulation which denied him the opportunity of teaching at the New School, an adult education institution in New York City.

In May 1973, elections for department chairman and membership on the appointments committee were conducted. The faculty defendants banded together and encouraged a majority of the faculty to back their candidate, Kent, for chairman. They were also successful in electing four members of their faction, Cannavo, Ezorsky, Koslow and Taylor, to the appointments committee. By motion that carried by a vote of seven to four, with Sprague abstaining, the committee elected defendant Robert Schwartz, who would not join the faculty until the fall of 1973, to replace Ezorsky on the committee for 1973–74, since she was taking a leave of absence that year. Sprague reported the election results to Kneller but questioned whether Schwartz could

properly be elected to replace Ezorsky since he was not yet a member of the faculty. He also questioned whether Kent should be confirmed as chairman. Kneller subsequently assigned defendant Sherman Van Solkema, who was vice-president and provost of the college at the time, to investigate the circumstances existing in the department and to recommend a course of action.

In May 1973, Van Solkema solicited and received views of Kent's capabilities from various members of the department, including plaintiffs, on the promise that there would be no reprisals for their candid judgments and that their reappointment and tenure applications would be decided by an outside board of review. Plaintiffs were among the faculty members who were of the opinion that the department should be placed in receivership before permitting Kent to become chairman.

Van Solkema reported the results of his investigation to Kneller and on May 31, 1973, Kneller announced that (1) Kent would only be designated as "Interim Chairman" and would not be confirmed as chairman; (2) he was appointing a search committee for a permanent chairman; and (3) Schwartz could not replace Ezorsky on the appointments committee because he was not yet a member of the faculty. Thereafter the committee decided to postpone election of Ezorsky's replacement until the following fall.

In September 1973, the committee voted for Ezorsky's replacement. Schwartz, who by that time was a member of the faculty, and Malcolm Brown, an associate professor and sympathizer of plaintiffs, each received seven votes. A compromise was struck whereby Brown would serve as member of the committee for the fall semester and Schwartz for the spring.

At this same meeting the committee nominated two of its members to fill the five-member search committee instituted by Kneller. Cannavo and Edwards each received eight votes, while Brown and Abigail Rosenthal, also a plaintiffs' sympathizer, each received six votes. Sprague asked Van Solkema to urge defendant Ethyle R.

Wolfe, dean of the school of humanities of which philosophy is a department, to appoint Brown and Rosenthal so that both teaching factions of the department would be represented in the search committee. Van Solkema refused.

On October 3, 1973, Brown and plaintiff Jere Jones, who were under consideration for reappointment, were asked to submit written materials to the appointments committee. Plaintiff David Massie, who was under consideration for tenure, was not told to submit written materials until the following day. Rosenthal, who had already submitted written material, was specifically told by both Kent and Taylor not to submit five chapters of a book which she had written since the spring.

On October 5, 1973, the committee voted for reappointment of Brown, Kent, Korn, Massie, Wiseman and Caffevtzis, but against Jones, Rosenthal and Smithurst.

Jones and Rosenthal subsequently instituted grievance proceedings alleging political reprisal. Kneller granted a *de novo* hearing and designated a college review committee, to be chaired by Van Solkema, to review the records. Van Solkema selected Hildegarde Wichert Five, a close friend of Cannavo, to head a subcommittee. The subcommittee conducted an investigation and reported to the full committee, which then conducted a hearing at which Sprague was permitted ten minutes to speak on behalf of Jones and Rosenthal while Kent was allowed twenty minutes to speak against them.

The review committee upheld the decision not to reappoint Jones and Rosenthal. The latter then filed a Step I grievance, which Kneller denied in January 1974. A Step II grievance resulted in an agreement between the Teachers Union and the Administration in which the grievance was remanded to Step I at the urging of defendant Robert Grossman. Grossman was the grievance officer at the college and was involved at least to some extent in all decisions regarding plaintiffs' status and acted as liaison between the parties and Kneller. Plaintiffs allege that the move to remand

to a Step I grievance was a scheme by faculty defendants and Grossman to reassure the non-reappointment of Jones and Rosenthal. But the alleged scheme apparently failed when on June 13, 1974, Kneller reappointed Jones and Rosenthal stating that "further academic evaluation is warranted" in both cases. However, on October 2, 1974, Jones and Rosenthal were for a second time denied reappointment by the committee.

In March 1974, Massie submitted written material to the committee with respect to his tenure application. Massie also advised Kent that a book-length manuscript had been submitted to seven scholars for review and that the committee should perhaps postpone consideration of his tenure pending their responses. He supplied Kent with a list of the scholars and the committee decided to postpone voting on Massie's tenure.

Thereafter, Massie discovered a letter from Kent to Professor Van Heijenoort of Brandeis University, dated April 1, 1974, which solicited criticism of Massie's manuscript. Massie protested on the ground that Van Heijenoort was personally hostile to him. Kent reassured him that Van Heijenoort's review would not be considered if negative. On May 9, 1974, the Committee voted to deny Massie tenure.

In the spring of 1974, Sprague and Brown met with Kneller to discuss, *inter alia,* Kent's qualifications to serve as interim chairman, and on June 10 they submitted a memorandum setting forth reasons why he should not be permitted to continue. In June 1974, Kneller removed Kent and named Cannavo as acting chairman.

On October 1, 1974, Cannavo asked plaintiff Fred Korn if he wanted to be considered for a certificate of continuous employment, somewhat akin to tenure, or for associate professorship. Korn requested the former, but on October 2, 1974, the committee voted not to recommend Korn for a certificate.

The plaintiffs also allege that of considerable importance in their failure to gain reappointment and tenure was the negative evaluations of their classroom technique submitted against them by faculty members. All of the evaluators were chosen by Kent and Cannavo, as interim and acting chairman respectively, and all were faculty members named as defendants.

In December 1974, each plaintiff initiated a union grievance. The college review committee set up by Kneller for the *de novo* hearings was chaired by defendant Donald R. Reich, who by this time had replaced Van Solkema as vice-president and provost of the college. The review committee upheld the committee's decisions to deny plaintiffs' reappointment and at a Step I hearing in March 1975, that decision was affirmed by Kneller. Plaintiffs' last day of work pursuant to their contracts was August 31, 1975.

### First Amendment Claims

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a teacher was discharged for writing a letter to a local newspaper criticizing the school board's handling of certain bond issue proposals and its allocation of financial resources between educational and athletic programs. The Court held that in determining whether a government employee's speech is constitutionally protected, "the interests of the [employee], as a citizen, in commenting upon matters of public concern" must be balanced against "the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35.

In a later case, the Court projected that view even further, holding that a public employee is not entitled to reinstatement even when constitutionally protected conduct plays a "substantial" part in a decision to terminate the employee, where the employer can show that termination would have occurred even in the absence of the protected conduct. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ Viewing the allegations of this complaint liberally as we must, it is manifest that the claims of constitutional violation asserted are insufficient on their face. Plaintiffs do not claim they were denied reappointment for speaking publicly or privately in criticism of college policies. What is so apparent on the face of the complaint is an attempt to draw the court into a stale dispute admittedly between "two factions in the department [who] did have a constant disagreement as to the most appropriate method of teaching certain classes and certain students." Plaintiffs' Memorandum of Law at 19. The conceded "conflict and dissension between two factions in the department"—again to quote plaintiffs, *id.* at 13—plainly amounts to nothing more than "bickering" among academic colleagues and hence cannot give rise to a violation of First Amendment rights. See *Pickering v. Board of Education, supra; Chitwood v. Feaster,* 468 F.2d 359 (4 Cir. 1972).[1] If it were otherwise, the door would be opened for countless appeals to federal judges to act as mediators in academic disputes—a task this court considers itself particularly unadapted to perform.

The Court of Appeals for this Circuit sitting *en banc* has recognized that not every claim asserted by a teacher requires an evidentiary hearing to determine the merits. In *East Hartford Ed. Ass'n v. Bd. of Ed., Etc.,* 562 F.2d 838, 856 (2 Cir. 1977) (*en banc*), the court declined to accord First Amendment protection to a teacher's symbolic "speech," i. e., his desire to wear a necktie. It stated:

"This final claim [that dress of this type enhances his ability to teach] does not implicate the First Amendment. It is merely an assertion that one teaching technique is to be preferred over another. It has no more to do with a constitutional interest than would a claim that closer 'rapport' could be achieved by arranging students' desks in a circle rather than in rows." *Id.* at 857 n.5.

Although *East Hartford Ed. Ass'n* involved high school education, it clearly cautions against federal court intervention except when First Amendment rights are truly in jeopardy as a result of official actions. Because teaching is by definition an expressive activity, every dispute over the best method of classroom instruction would raise First Amendment issues calling for federal court intervention. See *East Hartford Ed. Ass'n v. Bd. of Ed., supra,* 562 F.2d at 859.

Since plaintiffs have failed to allege anything more than an academic dispute with professional colleagues, their claims for relief under § 1983 and the First Amendment must be dismissed.

### Fourteenth Amendment Due Process Claims

■ Plaintiffs' right to maintain any due process claims depends, of course, upon whether their interest in continued employment rises to the level of "property" or "liberty" protected by the Fourteenth Amendment. *Simard v. Board of Education of Town of Groton,* 473 F.2d 988, 992 (2 Cir. 1973). In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court considered the interest of non-tenured teachers like plaintiffs. It concluded that to demonstrate a deprivation of liberty, a plaintiff must show that the reasons given for denial of tenure would damage his standing in the community or foreclose him from taking advantage of other employment opportunities. A property interest would be properly asserted only if plaintiff demonstrates more than a unilateral expectation of continued employment; he must show some legitimate claim of entitlement to it by pointing to concrete State rules or regulations or a well-established

---

1. We have considered in this connection the latest Supreme Court decision, *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), which plaintiffs recently called to the court's attention. That case, however, dealt with a teach- er's private encounters with a school principal in which she voiced criticism of employment policies and practices which she considered racially discriminatory. That situation is essentially different from the interfactional controversy involved here.

joint understanding amounting to a *de facto* tenure program. See *Simard v. Board of Education of Town of Groton, supra,* 473 F.2d at 992.

Plaintiffs do not, and apparently cannot, allege that they have a property interest in re-employment and tenure under *Roth.* Nor do they allege that any *de facto* tenure program existed upon which they can claim a property interest in their continued employment under *Perry.* Plaintiffs, moreover, have apparently conceded that they have been deprived of no liberty interest. The complaint fails to allege that anything defendants have done has seriously damaged plaintiffs' standing in the community or has imposed a stigma or other disability on them that has foreclosed their ability to take advantage of other employment opportunities. *Roth, supra,* 408 U.S. at 573, 92 S.Ct. 2701. See *Wahba v. New York University,* 492 F.2d 96 (2 Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Simard v. Board of Education of Town of Groton, supra; Russell v. Hodges,* 470 F.2d 212 (2 Cir. 1972).

In *Roth,* the Court made it clear that the stigma to which it referred must involve moral turpitude, for example that which attaches to a charge of dishonesty or immorality. 408 U.S. at 573, 92 S.Ct. 2701. The fact that a discharge might make a person less attractive as an employee or have a deleterious effect upon his future employment opportunities does not give rise to a right to a pre-termination hearing. *Id.* at 574 n.13, 92 S.Ct. 2701. And, more recently, the Court added yet another gloss to the *Roth* cases. It made it clear that the liberty interest recognized by *Roth* cannot be infringed upon without a showing that the public employer publicized the reasons for the termination. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). See also *Board of Curators v. Horowitz,* 435 U.S. 78, 83, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Longarzo v. Anker,* 578 F.2d 469 (2 Cir. 1978). Here, the allegations of the complaint simply do not state a claim of deprivation of liberty under *Roth.* See *LaBorde v. Franklin Parish*

*School Board,* 510 F.2d 590 (5 Cir. 1975) (decision not to renew teacher's contract because of dissatisfaction with teaching methods and classroom technique did not state a claim under *Roth* ). *Accord Blair v. Board of Regents,* 496 F.2d 322, 324 (6 Cir. 1974); *Russell v. Hodges, supra; Jablon v. Trustees of California State College,* 482 F.2d 997 (9 Cir. 1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974).

Plaintiffs argue, notwithstanding, that they have a property interest in a fair hearing, which they claim arises out of a bargaining agreement between plaintiffs' union and the BHE. The agreement assertedly grants non-tenured teachers the right of review and confrontation in the evaluation of their job status. Plaintiffs' Brief in Opposition at 26–27.

We do not believe that any constitutional right to due process recognized under the *Roth* and *Perry* line of cases supports plaintiffs' claim. These cases involved a public employee's right to a pre-termination hearing if a decision to terminate would deprive him of a property or liberty interest within the meaning of the cases. Here, plaintiffs have not alleged a deprivation of either property or liberty sufficient to withstand a motion to dismiss. Accordingly, it would be somewhat anomalous to conclude that a contractual right to review and confrontation actually afforded plaintiffs did not accord with established concepts of due process. In the court's view, this would open to constitutional litigation a number of claims foreclosed by the decisions in *Roth* and *Perry.* See *Eichman v. Ind. State Univ. Bd. of Trustees,* 597 F.2d 1104, 1108 (7 Cir. 1979). *Cf. Longarzo v. Anker,* 578 F.2d 469 (2 Cir. 1978). Since plaintiffs have pointed to no property or liberty right protected by the Fourteenth Amendment, their claims of violations of substantive and procedural due process are also dismissed. See *Webster v. Redmond,* 599 F.2d 793 (7 Cir. 1979); *Eichman v. Ind. State Univ. Bd. of Trustees, supra,* 597 F.2d at 1108.

*Conspiracy Under 42 U.S.C. § 1985(3)*

■ The deficiency of plaintiffs' § 1985(3) pleading is readily apparent. In

*Griffin v. Breckenridge,* 403 U.S. 388, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Court concluded that

> "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial or perhaps otherwise class-based, invidiously discriminating animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. at 102, 91 S.Ct. at 1798.

The language has been interpreted to require discrimination between classes based on racial bias, national origin or religion, *Perrotta v. Irizarry,* 430 F.Supp. 1274, 1278 (S.D.N.Y.), aff'd, 573 F.2d 1294 (2 Cir. 1977), citing *Hahn v. Sargent,* 523 F.2d 461 (1 Cir. 1975); *Arnold v. Tiffany,* 487 F.2d 216 (9 Cir. 1973), cert. denied, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974); *Western Telecasters, Inc. v. California Federation of Labor,* 415 F.Supp. 30 (S.D.Cal.1976), and the class must be "well defined" and "a traditionally disadvantaged group." *Santiago v. City of Philadelphia,* 435 F.Supp. 136, 156 (E.D.Pa.1977).

Although the complaint alleges a lengthy series of so-called overt conspiratorial acts, it fails entirely to set forth any allegation of class-based discriminatory animus. Whatever the scope of a § 1985(3) action, which is currently undergoing an evolutionary process, see *Great Am. Federal S. & L. Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Regan v. Sullivan,* 557 F.2d 300, 307–08 (2 Cir. 1977), the court is of opinion that the allegations of this complaint are insufficient, see *Ellentuck v. Klein,* 570 F.2d 414 (2 Cir. 1978); *Kletschka v. Driver,* 411 F.2d 436 (2 Cir. 1969); *Gordon v. Anker,* 444 F.Supp. 49 (S.C.N.Y.1977); *Morpugo v. Bd. of Higher Ed. in City of New York,* 423 F.Supp. 704 (S.D.N.Y.1976), notwithstanding plaintiffs' contention that a class of three members of a minority faction of a college department toward which "invidious animus" is directed satisfies the section's requirements. Plaintiffs' § 1985(3) claims are therefore dismissed.

## Monell Claims

Finally, the complaint under docket number 78 C 1780 asserts liability on the part of the Board of Higher Education of the City of New York and its officials under the theory of *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* the Court concluded that a governmental entity could be held liable if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. at 2036. Liability does not arise under § 1983, however, on a *respondeat superior* theory. *Dominguez v. Beame,* 603 F.2d 337 (2 Cir., 1979). Thus,

> "a local government may not be sued [under § 1983] for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2038.

And plaintiffs bear the burden of showing first that the governmental entity maintained or practiced an unconstitutional or unlawful "policy" or "custom," and second that the policy or custom "caused" or was the "moving" force behind the violation. *Dominguez v. Beame, supra,* 603 F.2d at 341. Finally, we assume for purposes of this discussion that *Monell* is applicable not only to plaintiffs' § 1983 claims but also to their § 1985(3) allegation. See *Owens v. Haas,* 601 F.2d 1242, 1247 (2 Cir., 1979); *Heimbach v. Village of Lyons,* 597 F.2d 344 (2 Cir., 1979).

Under the court's rulings above, it is clear there can be no liability under *Monell's* rationale. Moreover, plaintiffs do not, and apparently cannot, allege that any of defendants' actions were undertaken in "execution of a government's policy or custom."

Accordingly, defendants' motion to dismiss the consolidated complaints is granted.

SO ORDERED.